## CENTRAL RAILROAD AND BANKING COMPANY *v.* GEORGIA.

1. The consolidation of two companies does not necessarily work a dissolution of both, and the creation of a new corporation. Whether such be its effect, depends upon the legislative intent manifested in the statute under which the consolidation takes place.

2. An act of the legislature authorized two railroad companies (C. and M.) to unite and consolidate their stocks, and all their rights, privileges, immunities, property, and franchises under the name and charter of C., in such manner that each owner of shares of the stock of M. should be entitled to receive an equal number of the shares of the stock of the consolidated companies. The act also declared that all contracts of both companies should be assumed by and be binding upon C., that its capital should not exceed their aggregate capital, and that all their benefits and rights should accrue to it. It was further enacted, that, upon the union and consolidation, each stockholder of M. should be entitled to receive a certificate for a like number of shares of the stock of C., upon his surrender of his certificate of stock in M. *Held*, that consolidation under this act was not a surrender of the existing charters of the two companies, and that it did not work the extinction of C., nor the creation of a new company. *Held, further,* that the consolidated company continued to possess all the rights and immunities which were conferred upon each company by its original charter.

3. Exemption from liability to any greater tax than one-half of one per centum of its net annual income having been conferred upon C. by its charter, — *Held*, that it is not in the power of the legislature to impose an increased tax after the consolidation was effected. *Held, further,* that inasmuch as M. possessed no such immunity under its charter, the power of the legislature to tax its franchises, property, and income, remained unimpaired after its consolidation with C.

4. The purpose and effect of the consolidating act were to provide for a merger of M. into C., and to vest in the latter the rights and immunities of the former, not to enlarge them.    Therefore, M. having held its franchises and property subject to taxation, C., succeeding to the ownership, held them alike subject.

ERROR to the Supreme Court of the State of Georgia.

The case was argued by *Mr. Jeremiah S. Black*, *Mr. David Dudley Field*, and *Mr. A. R. Lawton*, for the plaintiff in error, and by *Mr. N. J. Hammond*, Attorney-General of the State of Georgia, and *Mr. Robert Toombs*, for the defendant in error.

MR. JUSTICE STRONG delivered the opinion of the court.

By an act of the legislature of Georgia, enacted in 1833, a charter, unlimited in duration, was granted to "The Central Railroad and Canal Company of Georgia," with power to make, construct, and maintain a canal or railroad from the city of Savannah to the city of Macon. The seventh section was as follows : —

"The said canal or railway, and the appurtenances of the same, shall not be subjected to be taxed higher than a half per cent upon its annual net income."

In 1835, by an amendment to the charter, the name of the company was changed to "The Central Railroad and Banking Company of Georgia ; " its capital stock was declared to consist of $3,000,000 : and the eighteenth section of the amendment enacted that "the said railroad, and the appurtenances of the same, shall not be subjected to be taxed higher than one-half of one per centum upon its annual net income; and no municipal or other corporation shall have the power to tax said company, but may tax any property, real or personal, of the said company, within the jurisdiction of said corporation, in the ratio of taxation of like property." Under this latter act the company was organized in 1836, and proceeded to build the railroad. By subsequent enactments, the capital stock was increased to $5,000,000, and the company was authorized to build its road *into* Macon.

In 1847 the legislature of the State, by a statute approved Dec. 27, 1847, incorporated "The Macon and Western Railroad Company," with power to build a railroad from Macon to At-

lanta.   The charter contained no exemption from taxation, and affixed no limits to it.   An amendment, however, was made to the charter by an act approved Feb. 9, 1869, and assented to by the company, by which authority was given to increase the capital stock to $2,500,000; and the chartered rights of the company were continued during the term of thirty years from its passage.   The amending act contained the following proviso : —

"*Provided, nevertheless*, that such additional stock as may be issued, as well as the present stock of said company, shall hereafter pay the same annual tax to the State as the other railroad companies of this State now do; viz., one-half of one per cent on the amount of the net income."

Under this charter the railroad was constructed to Atlanta. Thus the western terminus of the Central Railroad and Banking Company of Georgia, and the eastern terminus of the Macon and Western Railroad, were both fixed at Macon.

On the twenty-fourth day of August, 1872, the legislature passed an act authorizing the union and consolidation of the two railroad companies, under the name and charter of the first named, " The Central Railroad and Banking Company of Georgia."   As the true meaning and effect of this act is the basis of all the questions presented by the case, we quote the first section entire : —

" Be it enacted by the general assembly of the State of Georgia, that the Macon and Western Railroad Company, and the Central Railroad and Banking Company of Georgia, be, and they are hereby, authorized and empowered to unite and consolidate the stocks of the said two companies, and all the rights, privileges, immunities, property, and franchises belonging or attaching to said companies, under the name and charter of the said ' The Central Railroad and Banking Company of Georgia,' in such manner that each and every owner and holder of shares of the capital stock of the Macon and Western Railroad Company shall be entitled to and receive an equal number of shares of the capital stock of the consolidated companies : *Provided*, that nothing herein contained shall relieve or discharge either of said companies from any contract heretofore entered into, but that all such contracts shall be assumed by, and be binding on, the Central Railroad and Banking Company of

Georgia, and all benefits and rights under the same shall accrue to, and vest in, the said last-mentioned company: *And provided further,* that, upon such union and consolidation, the capital stock of the Central Railroad and Banking Company of Georgia shall not exceed the amount of the authorized capital thereof, and the present authorized capital of the Macon and Western Railroad Company added thereto."

The second section enacted, that the union and consolidation provided for should not take place until at least two-thirds of the stockholders of each company assented thereto.

By the third section it was enacted, that when it should be ascertained, in the manner provided, that the assent required in the second section had been given, it should be the duty of the board of directors of each company to complete said union and consolidation, and to certify the same under the corporate seals of said companies, to the governor of 'the State, to be filed in the office of the Secretary of State.

The fourth section is as follows: —

"Be it further enacted, that upon the union and consolidation herein provided for, each stockholder in the Macon and Western Railroad Company shall be entitled to receive a certificate of stock as a shareholder in the Central Railroad and Banking Company of Georgia for a like number of shares, upon the surrender of his certificate of stock in the former company, which new certificate shall entitle the holder thereof to the same rights, privileges, and benefits as attach to the holders of stock now held by the shareholders in said companies, or either of them."

Under the provisions of this act, and in the manner prescribed, the two companies united, the stock of the Central Company being at the time $5,000,000, and that of the Macon and Western being $2,500,000.

Such was the legal *status* of the Central Railroad and Banking Company on the twenty-eighth day of February, 1874, when the legislature passed an act entitled "An Act to amend the tax-laws of the State so far as the same relate to railroad companies, and to define the liabilities of such companies to taxation, and to repeal so much of the charters of such companies, respectively, as may conflict with the provisions of this act." The act required from each company an annual return

to the comptroller-general of the value of its property, without deducting indebtedness, each class or species of property to be separately named and valued, to be taxed as other property of the people of the State. It also required the railroad companies to pay the taxes assessed upon them, and it repealed conflicting laws. Pursuant to this act of 1874, the comptroller-general assessed a tax of $46,034.87 against the Central Railroad and Banking Company, and issued an execution to collect it. The company then paid the tax of one-half of one per cent required by the prior law, and instituted proceedings in the mode provided by the statute to resist the exaction of the remainder of the tax assessed, on the ground that by its charter it was not subject to be taxed higher than one-half of one per centum of its annual net income, and that the tax-law of 1874 impaired the obligation of its contract with the State. Having failed in the State courts, the case has been brought here for review.

It is not denied that, by the provisions of the charter granted in 1833, amended in 1835, and accepted by the Central Railroad and Banking Company, a contract was made that the company should not be taxed higher than one-half of one per cent upon its net income. Nor is it denied that the protection thus promised was as perpetual as the existence of the company itself. But it is contended on behalf of the State that the charter granted in 1833, and amended in 1835, was surrendered by the union and consolidation of the company under the act of 1872 with the Macon and Western Railroad Company; that the company is now existing under a charter granted by the latter act, a charter which is subject to repeal or modification at the will of the legislature; and, therefore, that the act of 1874, which imposes a more onerous tax than one-half of one per cent on the net income, is a violation of no contract, but that it is a legitimate exercise of legislative authority.

If it could be admitted, as contended by the State, that the charter granted in 1835 is no longer in existence, if in fact and in law it was surrendered in 1872, and if the " Central Railroad and Banking Company of Georgia " is a new corporation, created when it united with the Macon and Western Railroad Company, the consequences claimed by the State might, and

probably would, follow. The Code of Georgia, which went into operation Jan. 1, 1863, has the following provisions:—

SECT. 1682. "In all cases of private charters hereafter granted, the State reserves the right to withdraw the franchise, unless such right is expressly negatived in the charter."

SECT. 1683. "Private corporations heretofore created, without the reservation of the right of dissolution, and where individual rights have become vested, are not subject to dissolution at the will of the State."

Chartered rights granted subsequent to the Code may, therefore, be withdrawn. It is equally certain that those granted before Jan. 1, 1863, cannot be impaired by any legislative act.

Hence, it is of vital importance to this case to examine the effect of the union of the two companies, under what is called "the consolidation act of the legislature," of Aug. 24, 1872. Did the act contemplate a surrender of its charter by the Central Railroad and Banking Company, and the grant to it of a new charter, or a re-grant of the old? It may be that the consolidation of two corporations, or amalgamation, as it is called in England, if full and complete, may work a dissolution of them both, and its effect may be the creation of a new corporation. Whether such be the effect or not must depend upon the statute under which the consolidation takes place, and of the intention therein manifested. If, in the statute, there be no words of grant of corporate powers, it is difficult to see how a new corporation is created. If it is, it must be by implication; and it is an unbending rule that a grant of corporate existence is never implied. In the construction of a statute, every presumption is against it. True it is that in *McMahan* v. *Morrison*, 16 Ind. 172, where three corporations had consolidated under an act of the legislature, authorizing them to merge and consolidate their stock " *and make one joint company*," it was said that the effect of the act and the terms of consolidation under it was a dissolution of the three corporations, and at the same instant the creation of a new corporation with property, liabilities, and stockholders derived from those then passing out of existence. And this language was quoted approvingly by this

court in *Clearwater* v. *Meredith*, 1 Wall. 40. But in neither case was an assertion of this doctrine necessary to the decision made. The first was a suit against the consolidated company on a claim against one of the old companies, and the other was a suit by a party who had consented that the stock of a railroad company should be merged and consolidated with that of another company, against one who had guaranteed that the stock should be worth a certain price at a fixed time. After having consented that the stock thus guaranteed should be consolidated with other stock, he was not permitted to recover. And, indeed, we find no case decided in this country where the question directly arose, or was necessarily determined. There are numerous cases where a consolidated company has been held liable for the debts of the old companies, and where it has been held to possess the rights of the old companies; but this does not necessarily imply a surrender of all the old charters. So there are cases where it has been held that a consolidation cannot be consummated against the consent of a stockholder in one of the companies unless his stock is purchased. This, however, may be doubted as applicable to all cases; but, if universally true, it leaves open the question, whether the consolidation is the creation of a new company. *Lanman* v. *The Lebanon Valley R. R. Co.*, 30 Penn. 46, was a bill by a stockholder for an injunction against consolidation; and all that was decided was, that his interest must be protected before consolidation could take place. We are not called upon, however, now to determine whether a consolidation, effected under a statute making no express grant of new corporate existence, may not, in some cases, work a dissolution of the existing corporations, and at the same time the creation of a new company; for, in the present case, we think the act of 1872 plainly contemplated no such thing. It is true, the act speaks of union and consolidation. It authorizes the two companies to unite and consolidate their stock, and all their rights, privileges, immunities, property, and franchises; but it prescribes the manner in which this may be done, and its effect. It is to be done under the name and charter of the Central Railroad and Banking Company; that is, the union is to be under that charter, not under a new charter of a company bearing that name. The union is also to be in such a

manner that every holder of the shares of the capital stock of the Macon and Western Railroad Company shall be entitled to, and shall, on the surrender of their certificates, receive, an equal number of shares of the capital stock, as a shareholder in the Central Railroad and Banking Company of Georgia, as declared in the fourth section. But there is no provision for a surrender of the certificates of stock of the shareholders of the Central, and none for the issue of other certificates to them. Their rights, whatever they may be after the union, are evidenced only by certificates of stock of the company chartered in 1835. If that charter has gone out of existence, they are stockholders in no company. Again : the act declared that all contracts of either of the companies should be assumed by and binding on the Central Railroad and Banking Company, and all benefits and rights under the same — that is, under the contracts — should vest in that company, not in a new corporation then springing into life. Nowhere in the act is there an intimation of any legislative purpose that the Central Railroad Company should cease to exist. The Macon and Western Railroad Company was undoubtedly intended to go out of existence : for provision was made for the surrender of all the shares of its capital stock ; and without stockholders it could not exist. The existence of such a provision in regard to the one company, and its absence in regard to the other, is a strong argument in support of the conclusion that it was not intended the Central Railroad and Banking Company should surrender its charter, or dissolve. And still more, that company was authorized to increase its capital, plainly for the purpose of making room for the new shareholders entitled to come in by virtue of their ownership of shares of the dissolved company's stock. The language of this provision is significant. It is, that, upon the union and consolidation, the capital stock of the Central Railroad and Banking Company " shall not exceed the amount of the *authorized capital thereof*, and the present authorized capital of the Macon and Western Railroad Company added thereto." This refers plainly to the corporation which it was contemplated should exist after the union and consolidation of the two companies. What, then, was intended by the expression " authorized capital thereof ; " that is, authorized capital of the Central Company ?

Had this reference to a new company? Certainly not; for no new company had any authorized capital. It must have referred, therefore, to the old Central Railroad and Banking Company, in existence when the act was passed; and that was the company the amount of whose stock was to be limited after the union had taken place. That company was to continue in existence, and its capital was restricted to the amount of what had been previously authorized, augmented by a sum equal to the capital of the absorbed company. This view is confirmed by the language of a subsequent act of the legislature, enacted Feb. 20, 1873, the preamble of which is, " Whereas, the recent union and consolidation of the Macon and Western Railroad Company with the Central Railroad and Banking Company of Georgia, under the name and charter of the latter company, has largely *increased* the capital stock, and the number of stockholders of the said last-named company." What company was it whose stock had been increased by the union? Plainly, one that was in existence before the union, — the one under whose charter the companies had united. The stock of no new company had been increased. It is clear, therefore, that the legislature of 1873 did not understand that the old Central Company had gone out of existence.

If, then, this construction of the act of Aug. 24, 1872, be correct (and we cannot doubt that it is), that act contemplated and authorized no such union and consolidation of the two companies as should work a surrender of their charter by both of them, and the creation of a new company. At most, it intended a merger of the Macon and Western Railroad Company into the other, a mode of transfer of that company's franchise and property, and a payment therefor with stock of the Central Company. It is of no importance to the inquiry, whether a new corporation was created by the union and consolidation, that the Central acquired under the act new and enlarged powers as well as new stockholders. It was authorized to own and operate a railroad from Macon to Atlanta; to operate it as its own. It was also authorized to increase its capital stock. But the gift of new powers to a corporation has never been thought to destroy its identity, much less to change it into a new being. Such a gift is not a grant of corporate

existence. It assumes corporate life already existing. Nor is it a necessary inference from the provision of the act of Aug. 25, 1872, requiring the board of directors of each company to certify the union and consolidation to the governor of the State, that the union was intended to be a surrender of the charter of both companies, and the acceptance of a new charter. There were sufficient reasons for that requirement, without the large inference attempted to be drawn from it. They were, that it might appear in the office of the Secretary of State that the Macon and Western Railroad Company was no longer in existence, and that the capital stock of the Central Company had been increased.

Our opinion, therefore, is, that the charter granted to the Central Railroad and Banking Company of Georgia, by the act of 1835, was not surrendered by its action under the later act of 1872; that it still has all the rights that were originally conferred upon it, holding them under the charter originally granted to it; and, consequently, that it is not in the power of the legislature to impose upon it a greater tax than one-half of one per centum of its net annual income.

It is still to be determined, however, whether the exemption from a higher tax applies to that portion of the company's property which was the road and franchise of the Macon and Western Railroad Company before its merger into the Central Railroad and Banking Company. The Macon and Western never had any contract with the State limiting its liability to taxation. Its original charter said nothing upon the subject, and the amending act of Feb. 9, 1869, gave it no exemption. It simply provided that the company should thereafter pay the same annual tax to the State as the other railroad companies then did; to wit, one-half of one per cent on the amount of net income. It contained no negative words. It did not declare that higher taxation should not be imposed at any future time. At most, it raised only an implication that a higher tax would not be levied for the State. But it is a well-settled principle that a claim for exemption from taxation cannot be supported, unless the statute alleged to confer it is so plain as to leave no room for controversy. No presumption can be made in support of the exemption; and, if there be a reasonable doubt, it must

be resolved in favor of the State.   *Bailey* v. *Maguire*, 22 Wall.
215; *Delaware Railroad Tax*, 18 id. 206.   In the latter of these
cases, it was ruled that a provision in a charter, requiring a com-
pany to pay annually into the treasury of the State a tax of
one-quarter of one per cent upon its capital stock of $400,000,
did not prevent a subsequent legislature from imposing a fur-
ther or different tax upon the company.   To the same effect is
*The Commonwealth* v. *The Easton Bank*, 10 Penn. St. 451.

If, then, there was nothing in the charter of the Macon and
Western Railroad Company by which its property was ex-
empted from such taxation as the legislature might see fit to
impose, did the union and consolidation with the Central Com-
pany bring it within the exemption which the Central enjoyed?
We think it did not.   Nothing within the act of Aug. 24, 1872,
indicates that such was the intention of the legislature, and it
is not a necessary result of the consolidation authorized.   The
obvious purpose of the act was to vest in the Central Company
the rights, privileges, immunities, property, and franchises which
had belonged to the Macon and Western Company; not to en-
large those rights, or to bestow new immunities.   If, therefore,
the Macon and Western held its franchises and property sub-
ject to taxation, the Central, succeeding to the franchises and
property, holds them alike subject.   It took them just as they
were, acquiring no additional or enlarged rights as against the
State.   The case of *The Philadelphia & Wilmington Railroad
Co.* v. *Maryland*, 10 How. 376, in its leading features is not
unlike the one now before us.   There, three railway companies
were united and incorporated into one, in pursuance of statutory
authority.   One of the companies was by its charter partially
exempted from taxation; and the law which authorized the
union of the three companies declared that the new corpora-
tion should be entitled to all the powers and privileges and
advantages belonging to the uniting companies.   In constru-
ing this provision of the consolidating act, this court ruled,
that as the constituent companies held their corporate privi-
leges under different charters, the evident meaning of the pro-
vision was, that whatever privileges and advantages either of
them possessed should in like manner be held and possessed
by the new company, to the extent of the road they had re-
spectively occupied before the union; that it should stand in

their place, and possess the powers, rights, and privileges they had severally enjoyed in the portions of the road which had previously belonged to them, and be subject to the liabilities that rested upon them during their separate existence. A similar decision was made in *The Delaware Railroad Tax Case*, 18 Wall. 206. So in *Tomlinson* v. *Branch*, 15 id. 460, the same doctrine was maintained. Two railroad companies, the one exempt from taxation and the other not exempt, were authorized to unite, so that the latter should merge into the former; and the statute declared that thereafter all the rights, privileges, and property of the latter should be vested in the former, and that the former should be liable for all the debts and contracts of the latter. Under the statute, the union was consummated: and the question arose, whether the railroad property and works which had belonged to the company not exempt from taxation were exempt under the charter of the other after the union; and this court held that they were not. The case is hardly to be distinguished from the present, and it leads directly to the conclusion that the property and franchises formerly belonging to the Macon and Western Railroad Company (now converted into $2,500,000 of the stock of the Central Railroad and Banking Company) has no well-founded claim to exemption from such taxation as it is now argued the legislature is forbidden by the Federal Constitution to impose. It is not protected by any contract with the State. That property, by the articles of union between the two companies, sanctioned by the legislature, amounts to one-third of the entire property of the company which survived the union, and to that extent, to that extent only, is it taxable at any greater rate than was stipulated in the charter of the Central Railroad and Banking Company granted in 1835.

*The judgment of the Supreme Court must, therefore, be reversed, and the record be remitted, with instructions to reverse the order of the Superior Court, and direct further proceedings in accordance with this opinion.*

NOTE. — *South-western Railroad Company* v. *Georgia,* error to the Supreme Court of the State of Georgia, was argued by the counsel who appeared in the preceding case.

MR. JUSTICE STRONG delivered the opinion of the court. What we have said in *Central Railroad & Banking Company* v. *Georgia,* is applicable, in its largest ex-

tent, to the present case. It appears from the record that the South-western Railroad Company, chartered in 1845, with an exemption from taxation beyond one-half of one per cent of its annual net income, was united with the Muscogee Railroad Company, a company entitled by its charter to a similar exemption. The union was effected under an act of the legislature, approved March 4, 1856, the effect of which was to extinguish the Muscogee Company by its merger in the South-western. No new corporation was created by the union of the two companies; but the powers of the South-western were enlarged, and all the rights, privileges, and property of the Muscogee Railroad Company became the rights and property of the South-western. The exemption from taxation, which both the companies enjoyed under their original charters, cannot, therefore, be withdrawn by the legislature, and it is unaffected by the tax-laws of 1874.

*The judgment of the Supreme Court is reversed, and the record is remitted, with instructions to reverse the order of the Superior Court.*