ALEXANDER *et al.* v. ATLANTA AND WEST POINT
RAILROAD COMPANY *et al.*

1. The Atlanta and West Point Railroad Company has no authority under its charter to build a belt railroad from any point on its road to any other railroad.
2. When proposed amendments to a charter are fundamental, radical, or vital, the unanimous consent of the stockholders to their acceptance is essential. The corporate rights and privileges embraced in the general railroad law of this State, taken as a whole, would fundamentally, radically, and vitally amend the charter of the above-named company, if added thereto, and consequently could not be so added upon an application presented to the secretary of State by virtue of a resolution adopted by a majority only of the stockholders. Thus adopting such a resolution was not, in this case, "proper corporate action."
3. Such an application being unauthorized and unlawful, the granting of it was a mere nullity, and it therefore could not result therefrom that the company obtained as an amendment to its charter any particular portion or portions of the general railroad law, even though the same may have been such as could be lawfully accepted by a majority vote of the stockholders.

Argued May 26, 27, — Decided July 20, 1899.

Petition for injunction.    Before Judge Lumpkin.    Fulton county.    March 9, 1899.

*N. J. & T. A. Hammond, H. A. Alexander, Lawton & Cunningham,* and *J. R. Lamar,* for plaintiffs.    *Dorsey, Brewster & Howell, Joseph B. Cumming,* and *King & Spalding,* for defendants.

LUMPKIN, P. J.    On December 27, 1847, an act was passed "to incorporate the Atlanta and LaGrange Railroad Company." It conferred upon the incorporators the powers necessary "for the purpose of constructing railroad communication between the town of Atlanta in DeKalb county, or some convenient point on the Macon and Western Railroad between the city of Griffin and Atlanta, to LaGrange in Troup county." This act by its terms was to remain of force for twenty years.    See Acts of 1847, p. 178.    On December 14, 1849, the above-mentioned act was amended so as to authorize the company thereby incorporated to extend its road to the Alabama line at or near West Point, and the amending act also provided that "any contract made between said company and the Macon and Western Railroad Company for a junction of their road, and the joint use of said road, or any part thereof, shall be binding between the parties; and should any such contract or arrangement for a limited time suspend the completion of the Atlanta and LaGrange Railroad, the part of said road so suspended may be finished at any time within three years after the termination of said contract."    Acts of 1849–50, p. 238.    By an act approved December 22, 1857, the name of the Atlanta and La-Grange Railroad Company was changed to the "Atlanta and West Point Railroad Company."    This act also authorized the building of branch lines from any point on the company's line "to Greenville or Columbus," provided that "said branch or branches shall be built on bona fide subscriptions to the capital stock, subscribed and paid up sufficient for that purpose."    Acts of 1857, p. 66.    The above-recited act of 1847 and all acts amendatory thereof were, by an act approved December 21, 1866, continued in force for thirty years from the date just mentioned.    Acts of 1866, p. 121.    On December 19, 1896, an act was passed continuing in force for fifty years from that date

the charter of the Atlanta and West Point Railroad Company, "with all the powers and privileges which it possesses by vir- tue of said charter as herein amended." Acts of 1896, p. 93. The foregoing sets forth all portions of the acts cited now ma- terial. Other acts were passed in 1852, 1868, 1869, 1872, and 1874, relating to this company, but they have no bearing upon any question involved in the present case.

The Macon and Western Railroad Company was absorbed by and consolidated with the Central Railroad and Banking Company, of which, later on, the Central of Georgia Railway Company became the successor. For convenience, the Atlanta and LaGrange Railroad Company, which, as has been seen, became the Atlanta and West Point Railroad Company, will hereinafter be mentioned as "the West Point company," and the term " Central company" will be used to designate the company owning the railroad from "some convenient point" on which the West Point company was, by the act of 1847, authorized to build to LaGrange; that is, the words "Central company" must be understood as indicating both the old " Macon and Western " and its successors. The West Point company built its road from East Point, a station on the line of the Central company, to West Point. For many years it ran its trains into Atlanta over the track of the Central com- pany and used the terminal facilities of the latter, under a con- tract which was satisfactory to the two companies. In 1890 the West Point company purchased from the Central company a strip of its right of way, thirteen feet wide, extending from East Point to Nelson street in the city of Atlanta, and built a track thereon. Since then these two companies have used the two tracks from this street to East Point jointly; but as Nelson street is some distance from the union passenger-depot, and the West Point company has no terminal facilities except a freight-depot near the center of the city, which it can not reach otherwise than over the tracks of the Central company, it is still obliged to use the same and is so doing under a con- tract which is indefinite as to time. On September 13, 1898, an application in the name of the West Point company was presented to the secretary of State, for an amendment to its

charter, whereby it was sought to obtain all the corporate powers and privileges granted to railroad companies organized under the general railroad law for the incorporation of such companies.   This action was authorized by a majority of the stockholders, and not by unanimous consent.   On the contrary, it was vigorously opposed by a considerable minority. The secretary of State granted the application, and thereafter a majority of the directors of the company proceeded to take active steps to build a belt line of railroad, about six miles long, from a point on the company's road just outside the corporate limits of Atlanta to a point on the line of the Georgia railroad, also just beyond the corporate limits in that direction. These directors sought in this manner to obtain the means of reaching the union passenger-depot and the freight-depot of the West Point company over the tracks of the Georgia railroad, and thus secure, independently of the Central company, all needed terminal facilities.   A number of the minority stockholders of the West Point company filed an equitable petition to enjoin the building of this belt line.   After a hearing at which a considerable amount of evidence was introduced, the injunction was refused, and the petitioners excepted.

There was much contention, pro and con, as to the motives by which the management of the West Point company was actuated in attempting to build the belt line, and those which influenced the plaintiffs to interfere.   The moving directors claimed that their sole object was to benefit the West Point company, while the plaintiffs insisted that the real purpose of the enterprise was to advance the interests of other corporations.   On the other hand, the plaintiffs alleged that they had no purpose in filing the petition except to prevent an unauthorized act which would injure the value of their stock, and the reply was that the main thing which they sought was to keep the West Point company under the dominion and control of the Central company.   These matters are, however, immaterial to a proper determination of the case, and therefore we will not discuss them, but will confine ourselves strictly to a discussion and decision of the questions growing out of the main inquiry, which is: did the judge err in denying the

injunction? These questions are purely legal ones; for, upon the assumption that the West Point company has lawful authority to build the belt line, the decision below settles, so far as we are concerned, all controversy as to the expediency of building it. Coming, then, to the law of the case, we hold that the decision excepted to was erroneous, and will proceed to show why we have reached this conclusion.

1. Under its charter as embraced in the several acts above referred to, the West Point company had no authority to build the belt line. It was empowered to build a railroad from Atlanta, or some convenient point on the line of the Central company, to West Point. If it chose to build from such a point, it could use the track of the Central company into Atlanta on such terms as could be agreed on between the two companies; and if any contract between them as to this matter should cease to be of force, the West Point company could at any time within three years after the termination thereof build its own line into Atlanta. It first built from East Point to West Point, but in 1890 it did acquire a right of way from the Central company and did build into Atlanta on the narrow strip to Nelson street. There its Atlanta terminus has since remained, and from it the union passenger-depot and the freight-depot of the West Point company have been reached over the tracks of the Central company. It is now seeking to reach those points, not over a track of its own, but over those of the Georgia railroad. The question immediately in hand is, whether this company is endeavoring to do something authorized by legislative enactment. As has been made apparent, it could get into the city in two ways; (1) by using the track of the Central company, and (2) by building a track of its own. For a long time it did the former, and then it did the latter. Its object now is to get further into the city, but it is not endeavoring to do so in either of the prescribed ways. It is, in fact, seeking to obtain a new entrance to the center of the city, not over a line of its own, but over that of the Georgia railroad, and there is no authority in any of the acts mentioned for pursuing this course. The General Assembly expressly limited the West Point company to the Central company's tracks, in case it chose

to reach Atlanta over any line other than its own. This necessarily forbids its entrance over the line of the Georgia railroad. If it had so desired, the legislature could and would have enacted that the West Point company might enter the city over the line of any railroad company with which it could make satisfactory terms. The express mention of one company excludes all others.

If the West Point company had sought to extend its own line from Nelson street to the center of the city, we would then have the question whether or not it could lawfully do so under the acts above cited. But that question is not here now. Treating the proposed belt line as a "branch" road, there is no special legislative authority for building it, for the power of the West Point company in this respect was limited to building branches to Greenville and Columbus.

2. Were the provisions of the general railroad law lawfully added to the charter of the West Point company? If these provisions as a whole could be obtained by a majority vote of the stockholders, they were so added. If they could not be thus obtained, they were not lawfully engrafted upon the old charter. By accepting the amendment embraced in the act of 1896, the West Point company undoubtedly subjected its charter to legislative amendment. It must be noted, however, that the General Assembly did not force upon any railroad company the provisions of the general law. On the contrary, any such company, by presenting to the secretary of State an application "authorized by proper corporate action," "may amend its charter" so as to acquire any or all the corporate powers and privileges embraced in the general law. Civil Code, §§ 1840, 2178. What, then, constitutes "proper corporate action" in such a case? The rule seems to be well settled that "when the amendments are fundamental, radical, or vital, the acceptance must then be unanimous." 7 Am. & Eng. Enc. L. (2d ed.) 681, and cases cited in note. And see a full discussion of this subject in 1 Thomp. Corp. §§ 71 et seq. Also, *Snook* v. *Ga. Improvement Co.*, 83 *Ga.* 61, and authorities cited on page 65. If all the provisions of the general railroad law were added to the charter of the West Point company, would so doing make

"fundamental, radical, or vital changes" therein? The scheme of the legislative charter, as embraced in the several acts, was to build and operate a railroad between Atlanta and West Point. Under the general railroad law of this State, the company could indefinitely extend its railroad, build branch roads from any point on its line, consolidate with any other railroad company or lease the property thereof (if not a competing line), build and operate steamboats, etc., etc. Certainly, the original incorporators of the West Point company would never have recognized as their own the simple charter they obtained after such additions as these, and numerous others that might be mentioned, had been added to it. The "proper corporate action" to obtain such additional powers as those enumerated must be based on the unanimous consent of the stockholders. We do not think the requirement of a vote of two thirds before the capital stock can be increased or bonds be issued, included in section 2165 of the Civil Code, or the like requirement in section 2171 relating to a change in the direction of a railroad, can have any bearing upon the question under discussion. These provisions of the general railroad law are operative when that law constitutes the whole or a portion of a railroad charter. They have nothing to do with determining the manner in which an amendment to a charter not embracing those provisions shall be made.

3. The only remaining question is: If the West Point company could not by a majority vote of its stockholders adopt as a whole the provisions of the general railroad law, did it by thus attempting to do so lawfully obtain as amendments to its charter such portions only of that law as would not make fundamental, radical, or vital changes? Clearly it did not. In this connection, see 1 Thomp. Corp. § 53. We do not wish to be understood as now deciding whether or not the West Point company could by a majority vote of its stockholders have applied to and obtained from the secretary of State an amendment to its charter, embracing portions only of the general law, under which it could have built the proposed belt line. That is, we leave open the question whether an amendment conferring authority to do that work alone would, or would

not, constitute such a change in the charter as would require the unanimous consent of the stockholders. Be this as it may, we are confident that the company did not, upon the application made by its managing officers for all of the corporate rights and privileges embraced in the general law, obtain only such portions of them as could be properly and legitimately granted on a majority vote of its stockholders. It got all or none of these privileges, for the simple reason that the application presented in its name asked for all, and not a portion or portions. Who can say the majority would have asked for less, or which particular portion or portions they would have been willing to accept? As the company did not lawfully get all that those assuming to act in its behalf sought, it really got nothing.

The conclusion results that the judge ought to have granted the injunction.

*Judgment reversed. All the Justices concurring.*