## SOUTH WESTERN RAILROAD COMPANY *et al.*
### *v.* BENTON *et al.*

No. 16980.  April 10, 1950.

774

778

*Miller, Miller & Miller, Lawton & Cunningham,* and *Harris, Harris, Russell & Weaver,* for plaintiffs in error.

*Hall & Bloch,* contra.

HAWKINS, Justice. (After stating the foregoing facts.) The controlling question in this case is, whether the South Western Railroad Company (hereinafter called "South Western") can legally sell and convey its franchise and physical properties to the reorganized Central of Georgia Railway Company (hereinafter called "Central") upon the vote of a majority of its stockholders, or whether such a sale would have to be authorized by the unanimous consent of the stockholders.

Able counsel for all parties at interest have submitted most excellent briefs, showing exhaustive research. Due to the many underlying and fundamental principles of law and constitutional provisions which must be taken into consideration, and the conflicting lines of authority from other jurisdictions touching certain phases of the question, its solution has not been without difficulty.

It is insisted by the plaintiffs in error, the South Western and its officers and directors, that the South Western is authorized to sell its franchise and physical properties by majority vote of its stockholders under the provisions of the act of 1933 (Ga. L. 1933, p. 235), now codified as §§ 94-328 and 94-329 of the Code of 1933, as follows: "Any railroad corporation organized under the laws of this State, which has heretofore leased its property for a long term of years to another corporation, which lease has terminated, and the lessor is not a going concern or equipped to conduct the operations of a railroad company, is hereby authorized to sell or lease its property, rights, and franchises to another railroad corporation upon such terms as may be agreed upon by the board of directors of the selling or lessor corporation and assented to by the holders of a majority of its stock." Code § 94-328. "The railroad corporation to which a sale or

lease is made under the terms of the preceding section shall acquire all the property, rights, and franchises of the selling, or lessor, corporation." § 94-329. And it is insisted by the intervenors, Callaway, as Trustee, and Central, that South Western has such authority under the Code sections above referred to and also under the provisions of the General Railroad Law of 1892, as found in Code §§ 94-311 and 94-318.

It is insisted by the plaintiffs, now defendants in error: that the trial court properly held that these sections of the Code do not constitutionally apply to the South Western, for the reason that the charter of South Western contains no authority to the corporation to sell its franchise and property; that it has only the powers conferred upon it by its charter, and the general laws of force at the time of its enactment, to the effect that a railroad corporation cannot, without special authority or statute, alienate by sale its franchises or property essential to the performance of its duty to the public; that its grant of powers and exemptions is to be strictly construed, and its obligations are to be strictly performed, whether they may be one to the State or to individuals; that the charter constitutes a contract between the State and the corporation and between the stockholders themselves; and that to apply the provisions of these Code sections to the South Western would be violative of article 1, section 10 of the Federal Constitution (Code § 1-134), which provides that: "No State shall . . pass any . . law impairing the obligation of contracts," and of article 1, section 3, paragraph 2 of the Constitution of the State of Georgia (Code, Ann., § 2-302), which provides that "No . . law impairing the obligation of contracts . . shall be passed."

It must be borne in mind that the charter of South Western was granted by the General Assembly of Georgia by the act approved December 27, 1845 (Ga. L. 1845, p. 132), prior to the Code of 1863, wherein the State first reserved unto itself the power to change or modify charters granted by it, and prior to the enactment of the General Railroad Law of 1892, now codified under Chapter 94 of the Code, conferring upon railroad companies much broader powers than were granted to the South Western in its charter. The powers conferred by the charter of the South Western were strictly limited, Section 1 providing:

"That for the purpose of constructing a Rail Road communication between the City of Macon and the navigable waters flowing into the Gulf of Mexico," certain individuals shall hereafter be a body corporate with authority to "do all lawful acts properly incident to a corporation, or necessary and proper for the transaction of the business for which it is incorporated." Section 3 of the act provides: "That the company herein incorporated shall confine their efforts and enterprise to the building and completion of a Rail Road communication from the City of Macon to" named points. The several amendments to its charter were contained in the acts of the General Assembly as follows: Stockholders' meeting, when called, Ga. L. 1847, p. 184; authorizing branches to Albany and Fort Gaines, Ga. L. 1849-50, p. 243; authorizing Union Depot at Macon, Ga. L. 1849-50, p. 249; authorizing the Directors of South Western to lease its railroad to the Central Railroad and Banking Company of Georgia for such time and on such other terms as they deem best, Ga. L. 1851-52, p. 119; authorizing construction of bridges across the Chattahoochee River and the Flint River Extension, Ga. L. 1851-52, p. 121; authorizing consolidation with Muscogee Railroad Company, Ga. L. 1855-56, p. 187; and increase in capital stock, Ga. L. 1859, p. 329, Ga. L. 1860, p. 197; authorizing road from Americus to Albany, Ga. L. 1859, p. 329; branch road to Dawson, Ga. L. 1860, p. 197; number of Directors increased, Ga. L. 1862-63, p. 87; authorizing issue of bonds for certain purposes and execution of mortgages, Ga. L. 1872, p. 331.

By reference to this charter as amended, it will be observed that it contains no specific authority to sell its franchise or property. It is silent upon the subject.

It is insisted by counsel for all of the parties at interest that the court should take into consideration, in determining the question here presented, the laws existing at the time of granting the charter; that they must be taken as if expressly referred to or incorporated in its terms; and that the charter as a contract must be measured by the standard of laws in force at the time it was granted. Cited in support of this proposition are the following authorities which sustain this position of counsel: Home Building & Loan Assn. *v.* Blaisdell, 290 U. S. 398, 435

(54 Sup. Ct. 231, 78 L. ed. 413, 88 A.L.R. 1481); Long Island Water Supply Co. *v.* Brooklyn, 166 U. S. 685 (17 Sup. Ct. 718, 41 L. ed. 1165); 12 Am. Jur. 14, § 386; W. B. Worthen Co. *v.* Kavanaugh, 295 U. S. 56 (55 Sup. Ct. 555, 79 L. ed. 1298, 97 A.L.R. 905); Central Transportation Co. *v.* Pullman Car Co., 139 U. S. 24, 48 (11 Sup. Ct. 478, 35 L. ed. 55); Clarke *v.* Gold Dust Corporation (3 C. C. A.), 106 Fed. 2d, 598, 309 U. S. 671 (60 Sup. Ct. 614, 84 L. ed. 1017). But here ends any agreement between counsel as to the applicable law. Counsel for the plaintiffs in error insist that, at the time of the grant of this charter, "The common and statute law of England, of force in this State on May 14, 1776, remains of force, so far as it is not incompatible with the Federal or the State Constitution or has not been modified by statute" (*Grimmett* v. *Barnwell,* 184 *Ga.* 461, 464, 192 S. E. 191); and that, under this law, an ordinary corporation could sell its property and franchise on a majority vote of its stockholders. This seems to have been accepted as the law by many authorities with respect to an ordinary trading or manufacturing corporation formed solely for the pecuniary profit of its shareholders. For a learned discussion of this question, see article by Professor Edward H. Warren, in 30 Harvard Law Review, p. 335. See also 1 Morawetz on Private Corporations (2d ed.), § 413; Angell & Ames on Corporations (8th ed.), p. 490; Field on Corporations, § 486; Elliott on Private Corporations (3d ed.), § 600; Boone on the Law of Corporations (3d ed.), § 201; Parker *v.* Bethel Hotel Co., 96 Tenn. 252, 273 (34 S. W. 209, 214); State *v.* Woolen Mills Co., 115 Tenn. 266 (89 S. W. 741); Lauman *v.* Lebanon Valley Railroad Co., 30 Pa. St. 42 (72 Am. D. 685); Trisconi *v.* Winship, 43 La. Ann. 45, 49 (9 So. 29); Pringle *v.* Construction Co., 49 La. Ann. 301, 303 (21 So. 515); Wilson *v.* Proprietors of Central Bridge, 9 R. I. 590. But this authority seems to have been qualified in some jurisdictions, depending upon whether (1) the transfer is required by the exigencies of the business; or (2) the transfer is not required by such exigencies. In the first instance, a private corporation may transfer all of its property on the vote of a majority of its stockholders; and in the second instance, the transfer cannot be made against the dissent of minority stockholders. 13 Fletcher Cyc. Corps., § 5797. In Geddes *v.* Anaconda Copper

Mining Co., 254 U. S. 590, 595 (41 Sup. Ct. 209, 65 L. ed. 425), it is said: "It is, of course, a general rule of law that, in the absence of special authority so to do, the owners of a majority of the stock of a corporation have not the power to authorize the directors to sell all of the property of the company and thereby abandon the enterprise for which it was organized."

But we must remember that we are not here dealing with an ordinary trading or manufacturing corporation, but with a railroad corporation, chartered by a special act of the General Assembly. The general law existing at the time of the grant of the charter to the South Western was: "A railroad corporation cannot, without special authority of statute, alienate its franchise or property acquired under the right of eminent domain, or essential to the performance of its duty to the public, whether by sale, mortgage or lease." *Singleton* v. *Southwestern Railroad*, 70 *Ga.* 464 (2). It is further said in that case: "A corporation has only the power conferred upon it by its charter. Its grants of powers and exemptions are always to be strictly construed, and its obligations are to be strictly performed, whether they may be due to the State or to individuals." In Branch *v.* Jesup, 106 U. S. 468 (1 Sup. Ct. 495, 27 L. ed. 279), it is held: "As a general rule, a corporation cannot transfer its franchises, nor a railroad company its road, without legislative authority." See also Thomas *v.* Railroad Co., 101 U.-S. 71 (25 L. ed. 950) ; Pennsylvania Railroad Co. *v.* St. Louis &c. Railroad Co., 118 U. S. 290 (6 Sup. Ct. 1094, 30 L. ed. 83).

It is admitted in the answer of South Western and its officers that the General Railroad Law of 1892, enacted subsequently to the grant of its charter, has no application to it, and that, but for the passage of the act of 1933 (Code §§ 94-328, 94-329, supra), South Western could not sell its franchise and property. The intervenors, Callaway, as Trustee, and Central, take a different view, insisting that, both under the General Railroad Law of 1892 and the act of 1933, the company has such authority on a majority vote of its stockholders. Of course, if these laws can be held to apply to the South Western, this contention would be well founded. But do they apply? Attention is again called to the fact that this charter was granted in 1845, prior to the Code of 1863, where the State first reserved unto itself the power

to withdraw, change, or modify charters granted by it. The Code of 1863, §§ 1636 and 1637 (now Code §§ 22-1202 and 22-1203), provides as follows: "In all cases of private charters hereafter granted the State reserves the right to withdraw the franchise, unless such right is expressly negatived in the charter;" and "Private corporations heretofore created, without the reservation of the right of dissolution, and where individual rights have become vested, are not subject to dissolution at the will of the State."

In Central Railroad &c. Co. v. Georgia, 92 U. S. 665, 670, (23 L. ed. 757), the Supreme Court, after quoting the above Code sections, which became operative after January 1, 1863, said: "Chartered rights granted subsequent to the Code may, therefore, be withdrawn. It is equally certain that those granted before Jan. 1, 1863, cannot be impaired by any legislative act." This ruling was followed in Southwestern Railroad Co. v. Georgia, 92 U. S. 676 (23 L. ed. 762). In *Atlantic & Gulf Railroad Co.* v. *Mann*, 43 *Ga.* 200, 201, this court held: "The charter of this company is older than the Code, so that it cannot be controlled by section 753 of the Code." (Code of 1863.) In *Gardner* v. *Georgia Railroad &c. Co.*, 117 *Ga.* 522, 524 (43 S. E. 863), it is said: "When this charter was granted, and until the time the Code of 1863 went into effect, it is unquestionably true that the correlative rights and duties of a corporation prescribed by its charter constituted a contract on its part, the obligation of which could not constitutionally be impaired by subsequent legislation. This was decided in the Dartmouth College case, the principles of which, as was said by Chief Justice Waite in the more recent case of Stone v. Mississippi, 101 U. S. 816, 'have become so imbedded in the jurisprudence of the United States as to make them, to all intents and purposes, a part of the constitution itself.'" See also Trustees of Dartmouth College *v.* Woodward, 17 U. S. 518, 4 Wheat. 518 (4 L. ed. 629); *Mechanics' Bank* v. *Heard*, 37 *Ga.* 401, 411; *State of Georgia* v. *Augusta and Savannah Railroad Co.*, 54 *Ga.* 401.

But it is insisted by counsel for the plaintiffs in error: that the limits on the power of South Western to sell its franchises and property constituted no contract between the State and the stockholders of the corporation, or between the corporation and

its stockholders, or between the stockholders, but was a contract only between the corporation and the State, and for the benefit of the State, which the State had a right to subsequently waive, and which it did waive by the act of 1933 (Ga. L. 1933, p. 235) ; that the corporation was the obligor and the State the obligee; that the State had the right by legislative act passed subsequently to the grant of the charter to relieve the corporation of this obligation; and that such action did not amount to a material and fundamental change in the charter. Cited in support of this contention, are the following cases from other jurisdictions: Hinds County *v.* Natchez, Jackson & Columbus R. R. Co., 85 Miss., 599 (38 So. 189) ; Lauman *v.* Lebanon Valley Railroad Co., 6 Casey 42, 30 Pa. St. 42 (72 Am. D. 685) ; Black *v.* Delaware & Raritan Canal Co., 22 N. J. Eq. 130. The authorities cited seem to support this contention, and the reasoning in some of them is very persuasive.

However, we are bound by the decisions of our own court and of the Supreme Court of the United States. In Thomas *v.* Railroad Company, 101 U. S. 71 (1), it is held: "The powers of a corporation organized under a legislative charter are only such as the statute confers; and the enumeration of them implies the exclusion of all others." In *Hazlehurst* v. *Savannah &c. Railroad Co.*, 43 *Ga.* 13, this court, on page 55, said: "Every charter is a contract between the public and the corporators, and between the corporators themselves"; and on page 57 held: "Upon the question of the right of the directors to purchase the stock of the Macon and Western Railroad, we abide by the decision made in the case of *The Central Railroad* v. *Stephen Collins,* decided at December Term, 1869. We think the cases precisely parallel. If one railroad company may, at its option, buy the stock of another, it practically undertakes a new enterprise, not contemplated by its charter. This it cannot do by any implication. The power so to do must be clear, and that, too, under the rule of construction that the charter is to be strictly construed as against the power." In *Central Railroad Co.* v. *Collins,* 40 *Ga.* 582, 624, this court said: "Every charter of a private corporation is a contract, first between the State and the corporation— to which each is solemnly bound—the State that it will not impair the obligation—the corporation that it will perform the

objects of its incorporation and keep within the powers granted to it: 4th Wheaton, 518; secondly, between the stockholders themselves. . . Both as to the State and between the corporators, the law of this contract is the charter. The State has granted to it no rights, and the individual stockholders have clothed it with no rights, except such as are clearly and expressly set down in the charter: 13 Penn., 133, 28th Penn., 352; 18 Howard, 341." On page 632 of this same opinion it is said: "But it was said in the argument that the Legislature has plainly indicated, by its enactments, that the Central Railroad Company may acquire an interest in the management of the Atlantic and Gulf Railroad. By the act of 1852, the Central Railroad was clothed with power to lease several railroads by name as well as any other road that might 'connect' with the Central; and by the act of 1863 authority was given to the Central and Atlantic and Gulf, to connect their tracks at the city of Savannah. *To this it may, in the first place, be replied, that any such power, though expressly granted, does not bind any of the stockholders who do not consent to it. Each stockholder has rights in the nature of contract, rights in the limitations, as well as in the grants to the corporation, and even the Legislative will cannot, under the Constitution of the United States, impair those contract rights by making him, against his will, an adventurer in an enterprise not contemplated by the original charter.* . . But under the rules which we have referred to for the construction of chartered rights, that they must be construed strictly, not carried beyond the express words of the Act, that ambiguous words are to be construed against the company and nothing to be taken by implication or intendment, even the right to lease would not give the right to buy or to become permanently interested in a road by the purchase of its stock. The two enterprises are wholly different in their nature and in their risks, and a stockholder might well consent to one and refuse to consent to the other." And on page 633 will be found this language: "One word more upon this same branch of the subject. These grants of the right to lease, imply the assent of the road that is leased, and to draw from such a power, to wit: a power to control a road with its assent—*the assent, it must be remembered, of every one of its stockholders*—a right to control it by

purchasing a majority of its stock, is an implication of a right to the injury of the others, in the very teeth of the settled rules for the construction of such grants, which, as we have abundantly shown, has been universally adopted by the Courts, both of England and America." (All italics ours.) In Mayor &c. of Knoxville *v.* Knoxville & O. R. Co., 22 Fed. 758 (2), it is held: "Where the charter of a railroad corporation did not authorize the transfer of its franchise and other property to another corporation, upon the assumption by the latter of all the duties and obligations of the former, and upon issuing to the stockholders of the former an equal amount of the stock of the latter corporation, held, that it was not competent for the legislature, by authorizing such transfer, to do more than to waive the rights of the public. *It could not divest or impair the rights of the stockholders as between themselves, as guaranteed by the company's charter, without their consent.*" (Italics ours.) In 16 C. J. S., 756, § 319, we find this statement: "It has been said that the charter of a private corporation operates on a threefold relationship to establish a contract between the State and the corporation, between the corporation and its stockholders, and between the stockholders and the State, and also that it constitutes a contract between the stockholders inter sese." See also 4 Thompson on Corporations (3d ed.), 108, § 2501.

As already pointed out, the charter of the South Western, after defining the object of the company to build a railroad from Macon to the Chattahoochee, contains these words: "That the Company . . shall confine their efforts and enterprise to the building and completion of a Rail Road communication from the city of Macon to some point intermediate between Albany and Fort Gaines," etc. The minority stockholders are owners of stock in a corporation created for this limited purpose, and under the charter it had no right to sell its franchises and physical property. If the act of 1933 (Ga. L. 1933, p. 235), relied on by the plaintiffs in error, be considered as an amendment of this charter, it would constitute a fundamental, radical, and vital change in the charter, and the contract of the stockholders, by authorizing the corporation to abandon the very enterprise it was created to carry on and to sell its franchise and physical properties, and take in payment therefor and hold bonds of an-

other corporation, and thus become a holding corporation only of the securities of another corporation; and this could not be done without the unanimous consent of the stockholders. In *Alexander* v. *Atlanta & West Point R. Co.,* 108 *Ga.* 151 (33 S. E. 866), it was held: "The Atlanta and West Point Railroad Company has no authority under its charter to build a belt railroad from any point on its road to any other railroad. When proposed amendments to a charter are fundamental, radical, or vital, the unanimous consent of the stockholders to their acceptance is essential. The corporate rights and privileges embraced in the general railroad law of this State, taken as a whole, would fundamentally, radically, and vitally amend the charter of the above-named company, if added thereto, and consequently could not be so added upon an application presented to the Secretary of State by virtue of a resolution adopted by a majority only of the stockholders. Thus adopting such a resolution was not, in this case, 'proper corporate action.'" See also *Central Railroad Co.* v. *Collins,* 40 *Ga.* 582 (4) (supra), *Macon Gas Co.* v. *Richter,* 143 *Ga.* 397 (85 S. E. 112), *Johnson* v. *Tribune-Herald Co.,* 155 *Ga.* 204 (116 S. E. 810), *McKenzie* v. *Guaranteed Bond & Mortgage Co.,* 168 *Ga.* 145 (1) (147 S. E. 102), and cases therein cited. If this act of 1933 (Ga. L. 1933, p. 235) be not considered as an amendment to the charter, then the legislature could not by a general law do that which it could not do by specific amendment.

It is further insisted by counsel for the plaintiffs in error that —in view of the fact that the South Western has long been under lease, which has now been canceled, has no rolling stock or equipment, or other adequate facilities for the operation of its railroad, and that to properly equip it for operation would involve the expenditure of large sums of money—it would be to the best interests of the South Western and all of its stockholders to accept the offer made and to sell its franchise and property. An answer to this argument will be found in the *Collins* case, 40 *Ga.* 582, 617 (supra), where this court said: "We do not think the profitableness of this contract, to the stockholders of the Central and Southwestern Railroad stockholders, has anything to do with the matter. These stockholders have a right, at their pleasure, to stand on their contract. If the charters do not give

to these companies the right to go into this new enterprise, any one stockholder has a right to object. He is not to be forced into an enterprise not included in the charter. That it will be to his interest is no excuse; that is for him to judge. By becoming a stockholder he has contracted that a majority of the stockholders shall manage the affairs of the company within its proper sphere as a corporation, but no further; and any attempt to use the funds, or pledge the credit of the company not within the legitimate scope of the charter, is a violation of the contract which the stockholders have made with each other, and of the rights—the contract rights—of any stockholder who chooses to say, 'I am not willing.' It may be that it will be to his advantage, but he may not think so, and he has a legal right to insist upon it that the company shall keep within the powers granted to it by the charter: 1 Shelford on Railways, 71; 1 My. & K., 162-3; 4 Y. & Coll., 618, 2 Dan. P. C., 521; 5 Hill, 386; 18 Barbour, 318; 43 N. Hamp., 525; 6 Angell & Ames on Corp., 4th edition, and cases cited."

Under the foregoing authorities, we reach the conclusion that the trial court properly restrained and enjoined the South Western Railroad Company and its officers and directors from carrying into effect the act of a majority of the stockholders of the South Western, taken at the meeting of March 28, 1947, and from transferring or conveying to the reorganized Central of Georgia Railway Company, or to any other company, or to any one else, all the defendant company's railroad properties, rights, and franchises based on the aforesaid action of a majority of the stockholders, and from executing any written instrument which might convey the fee-simple title to the properties mentioned unto the reorganized company, or any other company, based on a mere majority vote of the stockholders of the South Western, and without unanimous consent of the stockholders.

On April 26, 1947, the South Western, its officers and directors, filed an amendment to their answer, and the Central and its trustee filed a like amendment to their intervention, seeking a modification of the temporary injunction granted by the trial court on April 24, 1947; and counsel for the plaintiffs in error insist that this court should direct a modification of the final decree in this case, wherein the officers and directors of the South

Western are permanently enjoined from doing and performing any act in behalf of South Western Railroad Company which might tend to consummate the plan of reorganization of Central of Georgia Railway Company with respect to the acquisition of the properties of the South Western Railroad Company, so as to prevent the South Western and its officers from joining with the Central in an application to the Interstate Commerce Commission for authority and approval of the acquisition of the properties of the South Western by Central. It is alleged and insisted that, under § 77 (f) of the Bankruptcy Act (11 U. S. C. A. § 205), and § 5 (11) of the Interstate Commerce Act (49 U. S. C. A., Pocket Part, § 5), the Interstate Commerce Commission has exclusive and plenary jurisdiction to authorize and approve the transaction here involved, notwithstanding any law of the State of Georgia that unanimous stockholder consent is necessary to the sale of South Western's properties and franchises; and that, under § 5 (11) of the Commerce Act, any carrier or corporation and its officers and agents participating in a transaction authorized or approved by the Commission under § 5 of the said act, is relieved from all "restraints, limitations, and prohibitions of law, Federal, State, or Municipal, insofar as may be necessary to enable them to carry into effect the transactions so approved."

These same contentions were made by these same parties in proceedings in the United States District Court wherein the reorganization of the Central was involved under § 77 of the Bankruptcy Act, and in that proceeding these same parties sought to enjoin the further prosecution of this proceeding in the State courts upon the same grounds and for the same reasons alleged in these amendments. The judgment of the United States District Court, granting such an injunction, was reversed by the Circuit Court of Appeals in Benton v. Callaway, 165 Fed. 2d, 877, and this judgment of reversal was affirmed by the United States Supreme Court in Callaway v. Benton, 336 U. S. 132 (69 Sup. Ct. 435, 93 L. ed. 553). In those cases it was held that § 5 (11) of the Interstate Commerce Act "relates to voluntary mergers, not to the purchase of a leased line as part of a plan of reorganization"; and further, that section 77 (f) of the Bankruptcy Act "does not . . give the Commission or court

the right to require acceptance by a lessor not in reorganization of an offer for the purchase of its property, and no such power has been asserted by the Commission in this case. The plan of reorganization in effect hands South Western a contract of sale. Whether or not South Western signs the contract must depend not only upon its business judgment, but also upon the charter of the company and the laws of the state of its incorporation. There is therefore no occasion to override state law. The plan implicitly accepts it as controlling." Moreover, § 5 (11) of the Interstate Commerce Act specifically provides that the sale may be effective on the vote "of a majority *unless a different vote is required under applicable State law, in which case the number so required shall assent.*" The United States Supreme Court having thus held that the question here presented is one for determination by the State Court, and this court having held that the trial court properly ruled that unanimous consent of the stockholders of the South Western was required under the State law for the sale of its franchises and properties to the reorganized Central, we will not assume that either the Interstate Commerce Commission or the United States Supreme Court would hold that the Commission would have the right to override and nullify the judgments of the State courts which were held to have jurisdiction to determine the question presented, or that the South Western and its officers could thus avoid, circumvent, and nullify the adjudication of this question by the State courts. The trial court did not err, therefore, in sustaining the demurrer to these amendments, for the allegations thereof showed no right to the relief sought.

■ Under the foregoing rulings, the trial court did not err in overruling the demurrers to the plaintiffs' petition, nor in sustaining the plaintiffs' demurrers to the answer of the defendants and to the intervention of the Central and its trustees in the nature of an answer to the plaintiffs' petition, nor in rendering the final decree enjoining the defendants as prayed.

*Judgment affirmed. All the Justices concur, except Atkinson, P.J., who dissents.*

ATKINSON, Presiding Justice, dissenting. The majority opinion is based on the legal assumption that the charter of the South Western creates a contract between the State and each

individual stockholder of the corporation, and that the act of 1933 was ineffective to increase the powers of the corporation in that it was unconstitutional as being an effort to abrogate the contract between the State and each individual stockholder.

It is clear that the charter was a contract between the State and the corporation, but is it a contract between the State and each individual stockholder? Under a charter the corporation is granted express and implied powers, which the State agrees not to impair, and the corporation agrees to operate within the powers granted. The individual stockholder's contract is not with the State, but with the corporation and with the other individual stockholders; the terms of the charter being his contract with the corporation, and the provisions of the bylaws define his contract with the other stockholders. There is no privity of contract between the State and each individual stockholder. The corporation and the stockholders are separate and distinct entities.

By the act of 1933, p. 235, the State did not abrogate or curtail any charter power it had given the South Western, but granted additional authority not previously conferred. Whether to accept and exercise the additional rights thus given to the corporation, was a matter for the corporation to decide, to be determined by a majority of the stockholders. The mere fact that the State through its General Assembly waived previous limitations upon its corporate powers and expressly broadened the authority of the corporation could not be said to impair its contract even with the corporation, and certainly did not abrogate a contract with the individual stockholders which did not exist.

While it is true that some of our Georgia decisions have inferred that a contract existed between the State and the individual stockholders of a corporation, yet there is no such ruling in any case. In *Central Railroad Co.* v. *Collins*, 40 *Ga.* 582, 632, it is stated: "Each stockholder has rights in the nature of contract, rights in the limitations, as well as in the grants to the corporation." Also on page 617 it is said: "These stockholders have a right, at their pleasure, to stand on their contract." But in this same case, on page 624, it is plainly stated that the charter is a contract between the State and the corporation.

This case, though largely relied upon in the majority opinion, did not turn on the question of any contract with the stockholders, but was a proceeding by minority stockholders, based on their contract with the corporation, to enjoin it from undertaking a new enterprise not contemplated by its charter, and therefore exceeding the powers conferred by its charter and also powers subsequently given by the State.

That the contract of the State is with the corporation and the contract of the stockholders is with the corporation, was again stated in *Snook* v. *Georgia Improvement Co.*, 83 *Ga.* 61, 65. While the general statement that a contract exists between the State and each stockholder is made in some cases and law publications, I have been unable to find any case which is based on such a ruling. The ruling in Trustees of Dartmouth College *v.* Woodward, 17 U. S. 518, 4 Wheat, 518 (4 L. ed. 629), went no further than to hold that a charter was a contract between the power granting it and the corporation.

Acts sought to be done which are not contemplated by the charter, and are enterprises vitally and radically different from the original purpose for which the corporation was chartered, are such acts as require unanimous consent of the stockholders. This is the basis of the decisions upon which the majority cpinion relies, and such decisions are predicated on the fact that a contract exists between the stockholders and the corporation. But the decision in the instant case is not based upon a breach of such a contract, but by reason of a breach of contract between the State and the stockholders.

To hold that the State, by waiving certain of its rights in the charter and extending additional rights to the corporation, violates the Federal and State Constitutions, in that it impairs the obligation of the contract of each stockholder, is recognizing a contract that does not exist.