HINDS AND ADAMS COUNTIES *v.* NATCHEZ, JACKSON & COLUMBUS RAILROAD COMPANY ET AL.

1. CORPORATIONS.   *Sale of franchise.   Purchaser.   Want of legislative power.   Stockholders.*

   Where a corporation, being authorized to sell, sells its franchise to another corporation, the stockholders of the seller cannot avoid the sale because of the want of power in the purchaser to buy.

2. SAME.   *Railroads.   Laws 1890, ch. 502, p. 675.   Natchez, Jackson & Columbus Railroad Company.   Power to sell.*

   The Natchez, Jackson & Columbus Railroad Company was empowered, under Laws 1890, ch. 502, p. 675, to sell its railroad franchises and property by a vote of a majority of its stockholders without the consent of the minority.

3. SAME.   *Stockholders.   Power of majority.   Sale.*

   A private corporation, doing an unprofitable business, may sell its entire assets upon a vote of the majority of its stockholders, even in the absence of an express enabling statute; and with such a statute the majority may sell all of the assets of an insolvent public corporation.

4. SAME.   *Counties.   Consenting to sale of stock.*

   A county which owned a majority of the stock of a railroad for eleven years, and, with another county, controlled the road for five years longer, and which was represented by the president of its board of supervisors at every meeting of the stockholders during the entire period, and participated, through its representative, in the issuance, hypothecation, and sale of stock to a certain person, could not question the validity of the stock so issued, in the hands of its holder.

5. SAME.   *Meetings.   Minority bound by acts of majority.*

   A stockholder in a corporation is bound by the act of a majority where due notice of a stockholders' meeting was given, although he was absent and unrepresented at the meeting.

6. SAME.   *Counties.   Railway stocks.   Non-governmental capacity.*

   Counties which issue bonds for railway stock do not own and hold the stock in a governmental capacity, but hold it in the same way and subject to the same rights and obligations as private corporations and individuals.

7. SAME.   *County appointing director.   Estoppel.*

> A county which holds stock in a railroad under a contract of sub-
> scription, giving it the right to be represented in the directorate,
> and which appoints a representative to act as director, is bound
> by the action of its representative in participating at a directors'
> meeting in a sale of the corporation's franchise and assets, and
> is estopped to repudiate such action.

FROM the chancery court of, first district, Hinds county.

HON. ROBERT B. MAYES, Chancellor.

Hinds and Adams counties, Mississippi, were the complain-
ants in the court below; the Natchez, Jackson & Columbus Rail-
road Company; the Louisville, New Orleans & Texas Railway
Company; the Yazoo & Mississippi Valley Railroad Company;
the Farmer's Loan & Trust Company; and the Union Trust
Company were defendants there.   From a decree in favor of
the defendants the complainants appealed to the supreme court.

The charter under which this controversy arises is the act
incorporating the Natchez & Jackson Railroad Company.   See
Laws 1870, p. 221; amended Laws 1872, p. 279, authorizing
the name to be changed to Natchez, Jackson & Columbus Rail-
road Company.   In 1871 Adams county subscribed $600,000 to
the capital stock, paying therefor by county bonds, and thereby
acquired 12,000 shares of stock, as against 160 shares held by
all other subscribers.   By January, 1873, twelve miles of road-
bed had been completed, and depot grounds in Natchez donated
by the city.   The financial panic of 1873 came on, and the
board of supervisors of Adams county made so much trouble
about the $600,000 of aid bonds that a compromise was effected,
whereby the county's subscription was reduced to $300,000,
and all bonds in excess of that amount were surrendered.

The work of construction progressed but slowly.   The com-
pany had no resources except the Adams county subscriptions,
paid in bonds as stated.   It borrowed small sums of money on
ordinary one-year mortgages from time to time.   In 1878 the
grading had reached Martin, but the track laying was still eight
miles short of that place.   In that year Hinds county subscribed

$200,000, payable in bonds, but required that two directors should be appointed from and by the county and also required the subscription to be used on work in Hinds county; and the road was still nineteen miles from the county line. There was a nineteen-mile chasm to bridge in some way. In March, 1880, a $600,000 second mortgage was authorized, of which, however, only $27,500 was ever negotiated. In June, 1880, a $200,000 consolidated first mortgage was authorized, which was to be, and was, used in funding the previous mortgage debts, except the $27,500 second mortgage bonds. In 1881 the city of Natchez lent to the company $225,000 of the city's bonds, the company agreeing to protect the city against payment of either principal or interest, and depositing as collateral security for that agreement an equal quantity of stock, with voting power, and also the $600,000 second mortgage bonds above, less the $27,500 of which disposition was otherwise made.

In May, 1882, the company still urgently needed $150,000 to complete the road to Jackson; but its resources were exhausted. The stock liabilities of the company were as follows:

Adams county, stock issued in 1871.......$300,000
Hinds county, stock issued in 1882........ 200,000
City of Natchez, stock issued in 1882...... 225,000
All other stockholders, issued various times.   35,807

Total amount stock..................$760,807

The company then authorized the sale of $1,500,000 of stock at ten cents on the dollar, in order to raise the $150,000 needed, with the right reserved to repurchase the same within eight months at the price paid. The stock so sold was to be exchanged for the purchasers' *notes*, which in turn were to be discounted. In fact, and in effect, the plan was to borrow $150,000 of personal notes from friends of the company to meet the emergency and to secure those notes when discounted by $1,500,000 of stock as collateral. This plan was carried out, the money raised.

The $150,000 of notes fell due in June, 1883, and in the meantime railroad securities of every kind depreciated.

And so, in the latter part of 1882, the road got into Jackson. Its bonded and floating debts were then $380,286; its interest payments were about $53,053 annually, or about $17,887 in excess of its net earnings. It was, therefore, getting deeper into debt every year.

A plan was devised for a new consolidated mortgage at a lower rate of interest and in better form; and President Martin was sent, in 1883, to New York to place the bonds. He failed to find purchasers, and only succeeded in making an arrangement in May, by which the company purchased from one J. W. Drexel, on credit, $320,000 of mortgage bonds of the New York, West Shore & Buffalo Railroad Company, then worth about 90 cents on the dollar, for which it gave its own notes to the amount of $304,000 at 8 per cent interest, due in June, 1884, and pledged as security therefor the same $1,500,000 of stock which had been previously pledged for the $150,000 loan aforesaid, and also the proposed $1,250,000 of new mortgage bonds. Those Lake Shore bonds the company afterwards sold for $250,730, and with the proceeds paid off the $150,000 loan before mentioned.

These Drexel notes were afterwards extended, from time to time, the interest being paid in part only, until the 1st of June, 1885, under an agreement that if not paid then, Drexel was to become absolute owner of the company bonds and stock pledged as security, upon the further payment by Drexel of about $425,000 needed to pay off prior liens and debts.

In January, 1887, the Drexel notes were still unpaid, time having been further extended under the above agreement. The city of Natchez then demanded a settlement; and in February, 1887, the company borrowed from Drexel a further sum of $226,050 on a note due April 7, 1887, with which to pay off the $225,000 Natchez bonds and interest due on them, according to its original agreement with the city set forth above. To

secure this loan the company pledged to Mr. Drexel the same $572,500 of mortgage bonds unsold out of the once proposed $600,000 issue, which had been pledged to the city, as above stated. In other words, Drexel paid off the city bonds for the company, and was subrogated to the city's security. The city's *stock* in the company was also delivered to him as collateral.

In April, 1887, Mr. Drexel called for a settlement, and the company directors authorized the president to issue $1,500,000 of stock to his order when he should surrender the stock certificates and evidences of debt following: The $304,000 note of the year 1883; the $226,050 note of February, 1887; bonds of the first mortgage of 1880 amounting to $174,400; all company bonds of the proposed $600,000 mortgage held as collateral (including the $27,500 thereof which had been actually sold); the $1,500,000 of company stock previously pledged as collateral as shown above.

Those surrenders were made, and Mr. Drexel thereby became the owner of the company's $1,250,000 consolidated (and only unsatisfied) mortgage, and $1,500,000 of stock out of a total issue of $2,035,800 (of which Adams county held $300,000 and Hinds county $200,000). Such stock and bonds, so acquired by him, cost Mr. Drexel in cash and in unpaid accrued interest due him about $758,750, which, it is claimed by appellees, was a full value for the road in its then condition.

A new manager of the road was then appointed—Mr. T. J. Nichol—and in January, 1888, a new board of thirteen directors was elected, by *unanimous* vote, of whom six had served on the previous boards as constituted by the votes of the two counties.

In March, 1889, Mr. Drexel had died, and his stock and bonds were sold to the Financial Improvement Company for $800,000 of the first mortgage bonds of the Louisville, New Orleans & Texas Railway Company, the railroad of which had been constructed by the Financial Improvement Company, and paid for to that company by Louisville, New Orleans & Texas

Railway Company bonds, of which the said $800,000 constituted a part. This Financial Improvement Company was owned by C. P. Huntington and by R. T. Wilson & Co., in the proportions, respectively, of 60 per cent and 40 per cent of the whole. The $1,250,000 of bonds of the Natchez, Jackson & Columbus Railroad Company, which they so acquired, were by them placed as collaterals for the entire issue of first and second mortgage bonds of the Louisville, New Orleans & Texas Railway Company.

In September, 1889, the new holders set about making the gauge of the road of standard width and adapting the road to an effective interchange of cars with the Louisville, New Orleans & Texas Railway Company. In January, 1890, at the annual meeting of stockholders, new directors were elected, all again *unanimously,* of whom a majority were connected officially with either the Louisville, New Orleans & Texas Railway Company or with the Financial Improvement Company.

Still the company continued to lose money each year, and in 1890 it sold its road to the Louisville, New Orleans & Texas Railway Company by a deed and by authority of an act of the legislature, approved February 19, 1890; the consideration expressed in the deed was $180,000, the sale being subject to the $1,250,000 mortgage. The road was thus converted into a part of the Louisville, New Orleans & Texas Railway system.

In February, 1892, an entire change in the ownership of the Louisville, New Orleans & Texas Railway Company's stock and bonds, formerly held by the Financial Improvement Company, occurred; and in October following the Louisville, New Orleans & Texas Railway Company and the Yazoo & Mississippi Valley Railroad Company were consolidated under the name of the latter company, which succeeded to all the rights and liabilities of the Louisville, New Orleans & Texas Railway Company.

The bill of complaint in this cause was filed in 1899 by Hinds county, Adams county joining later, for the purpose of setting aside the deed and sale of 1890, canceling the $1,250,-000 of bonds and the $1,500,000 of stock, reorganizing the

Natchez, Jackson & Columbus Railroad Company (excluding the $1,500,000 of stock aforesaid), and for an accounting of profits, alleged to be large. Decree by the court below for defendants.

*Green & Green, Williamson & Wells,* and *E. E. Brown,* for appellants.

That Hinds county and Adams county were stockholders of the Natchez road by subscriptions to and payment upon shares of the capital stock under its charter, and that by the transactions recited they had lost their $600,000 so invested, and had been defrauded of the property, rights, and franchises of the Natchez road by a pretended sale of the Natchez road by the Louisville, New Orleans & Texas Railway Company to itself. That these counties subscribed and paid for nearly all of the capital stock of the Natchez road, and were, without their knowledge or consent, deprived of this property so owned by them. That, generally speaking, the method by which this was brought about was by the issuance of 30,000 shares of stock to Jesup, and called the "Jesup stock," by the directors without authority, illegally, and in fraud of complainants' rights to pay two alleged debts, one for $226,050 to Jesup, trustee for Drexel; the other promissory notes for $304,000 to Drexel. That the $226,050 claimed to be an indebtedness of the Natchez road arose under an *ultra vires* agreement between the directors of the Natchez road and the city of Natchez, whereby the city of Natchez voted to subscribe for shares of stock of the Natchez road for $225,-000 and to issue its municipal bonds therefor, under the power granted by the charter of the Natchez road; and then the directors, after the void agreement, whereby the Natchez road agreed to pay the principal and interest of said city of Natchez bonds for $225,000 and to deposit $600,000 of its bonds, authorized to be issued only for construction, as collateral security to indemnify and save harmless the city of Natchez from its said subscription to the capital stock. The other alleged indebted-

ness of $304,000 arose out of the "New York loan" by Drexel to the Natchez road in New York, and whereby was exacted as usury, out of the $304,000, face of notes, the sum of $95,873; in other words, to get $208,126.23 the directors of the Natchez road authorized the giving of the notes by the Natchez road for $304,000. The urgent necessity of raising this $208,000 was that a number of its directors had given their accommodation paper to the Natchez road for $150,000 face, and the affairs of the company were becoming embarrassed, and so these directors, constituting a majority of the board who authorized and voted on this $304,000 loan and the subsequent transactions pertaining thereto, to get the money to pay this accommodation paper authorized this usurious loan.

To get the money to perform the *ultra vires* contract to pay the city of Natchez bonds for $225,000, the board of directors of the Natchez road borrowed $225,000 from Jesup, trustee, and gave the $572,500 of the $600,000 issue of mortgage bonds as collateral. These were the two debts for which the 30,000 shares of "Jesup stock" were issued, and the $1,250,000 of first mortgage bonds of September 1, 1882, were claimed to be negotiated.

The 30,000 shares so issued were, under the resolution of the board of directors, to take up all the indebtedness shown by the June 4th contract, then held by the Farmers' Loan & Trust Company, and under this the $1,250,000 of first mortgage bonds should have been surrendered and canceled; but, instead, they were delivered to Jesup, without any consideration whatever, and he and associates, then in practical control of the road, through the 30,000 shares of stock held by them, treated these bonds as their private, personal property, and as if they had been issued to them; and thus the $1,250,000 of bonds became outstanding in the hands of Jesup and associates. With possession of the 30,000 shares, Jesup and associates, through Nichol, took charge of the Natchez road, and ran it in their own interest and to suit themselves. On March 2, 1889, Jesup

made a private deal for the railroad, as if his private property, with the Financial Improvement Company, *alias* Wilson, Huntington, and associates, *alias* Louisville, New Orleans & Texas Railway Company, a copy of which is attached to R. T. Wilson's deposition, and recited in the bill, whereby it was agreed that Jesup had sold, and on or before May 1, 1889, would deliver, to the Financial Improvement Company the $1,250,-000 first mortgage bonds, and $1,500,000 of capital stock par value (30,000 shares), being all that was owned or controlled by Jesup out of a total of $2,028,000 par value of the capital stock of the Natchez road, and "would on or before said date cause a majority of the board of directors of the Natchez, Jackson & Columbus Railroad Company to be reconstructed by successive resignations, so that said parties designated by the said Financial Improvement Company shall constitute a majority of the board of directors, it being understood by this that Jesup shall place in the hands of the Financial Improvement Company a written resignation of a majority of said directors. (2) That upon such delivery of said bonds and stocks and said reconstruction of said board of directors the said Financial Improvement Company will pay to said Jesup $800,000 par value of the first mortgage 4 per cent gold bonds of Louisville, New Orleans & Texas Railway Company, carrying coupons maturing September 1, 1889, and subsequent coupons less the accrued interest from March 1, 1889. (3) That Jesup is entitled to all cash in hand and accounts receivable of the said Natchez road up to and including April 30, 1889, and is to pay, indemnify, and save harmless said Financial Improvement Company and its successors against all debts against the Natchez road ('debts' to include all existing indebtedness of operation, construction, and equipment and acquisition of right of way) up to and including April 30, 1889, except the $1,250,000 of first mortgage bonds. (4) That Financial Improvement Company has assumed in behalf of Natchez road its existing contracts with Joliet Steel Company for about 300 tons of steel rails at

$33 a ton.   (5) That Jesup shall not sell or dispose of the $800,000 of bonds for five years; but if R. T. Wilson and C. P. Huntington and associates shall, during said five years, make a sale of their bonds, issued under the same mortgage, then Jesup to have the privilege of participating *pro rata* in such sale.   (6) That if Jesup, prior to May 1, 1889, shall find it will cost more than $10,000 to pay for the right of way and other claims, other than the current indebtedness of Natchez road, and the Financial Improvement Company will not pay the excess over that amount, then Jesup to have right to cancel this contract."

This contract was performed, and after May 1, 1889, the Louisville, New Orleans & Texas Railway Company was in possession of the Natchez road, and its auditor audited its accounts, and on July 1, 1889, the two were managed by common executive officers.

In January, 1890, the stockholders' meeting of Natchez, Jackson & Columbus Railroad Company was controlled through the "Jesup stock," then held by the Louisville, New Orleans & Texas Railway Company, or by its *alter egos* for it, and the control of the Natchez, Jackson & Columbus Railroad Company was made effective by the election of its own board of directors. Being thus in actual control, the Louisville, New Orleans & Texas Railway Company, through its attorney, drew a bill to authorize Natchez, Jackson & Columbus Railroad Company to sell its property or to consolidate the same, and it was passed by the legislature through the instrumentality of Gen. Martin, then attorney of the Natchez road, and under this act the authority was claimed whereby the Louisville, New Orleans & Texas Railway Company, then in possession and control of Natchez road, pretended to purchase it under a contract made with itself, under *ultra vires,* illegal and fraudulent resolutions, for a recited consideration of $180,000 cash, which was not paid, and subject to the said $1,250,000 of bonds so unlawfully outstanding, and the Louisville, New Orleans & Texas Railway Company to provide for the payment of all the indebtedness and

obligations incurred since May 1, 1889, the date of its taking possession under the contract with Jesup.

The agreement by the board of directors to pay the $225,000, city of Natchez bonds, given in payment of the subscription of Natchez to $225,000 of the shares of the capital stock of the Natchez road, and the payment of these bonds by the loan of $226,050 from Jesup, trustee, were *ultra vires* and void.

The powers conferred by the charter of the Natchez road (Laws 1870, p. 221) upon cities and counties were expressly limited to subscriptions to the capital stock and to the issuance of city or county bonds in payment for said subscription. Sec. 15 expressly limits the power to "may subscribe to the capital stock." By sec. 16: "No such subscription shall be made until the question has been submitted to the legal voters" upon petition, "in which petition the amount proposed to be subscribed shall be stated" for the purpose of voting for or against such subscription. By sec. 17: If two-thirds of the legal voters vote "for subscription," "it shall be the duty of . . . the chief executive officers of such incorporated city . . . to subscribe to the capital stock of said railroad company in the name of such . . . city . . . the amount so voted to be subscribed, and to receive from said company proper certificates therefor. He shall also execute to said company, in the name of such city, . . . bonds bearing interest at 7 per cent *per annum,* . . . said bonds shall be delivered to the president . . . of said company for the use of said company." By sec. 19: A tax is required to be levied to pay the same.

Article XII., sec. 14, Constitution 1869, provides: "The legislature shall not authorize any county, city, or town to become a stockholder in, or to lend its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town at a special election or regular election, to be held therein, shall assent thereto."

Here are two powers that may be authorized by the legisla-

ture upon a two-thirds vote: One, a subscription to stock; the other, to lend its credit.

This sec. 14 was construed in *Hawkins* v. *Carroll Co.,* 50 Miss., 737, to prohibit the legislature from authorizing a subscription to the capital stock or a lending of credit, without an antecedent vote of two-thirds of the voters; and that "assent" meant "agreement or consenting to," "and this can be manifested in an election only by an affirmative action, by actually voting."

The answer does not claim that the acts of the city of Natchez were a subscription to the capital stock, but that it was the lending of the city's credit to the railroad company through the form of the subscription of stock. If the city of Natchez was merely a stockholder, then it is manifest that the directors could not mortgage the road to pay off a part of the stock; and so the claim is now made that it was a loan of the city's credit. *Hill* v. *Memphis,* 134 U. S., 198; *Hawkins* v. *Carroll Co., supra; Johnson City* v. *Railroad,* 100 Tenn., 138; *Lewis* v. *City of Shreveport,* 108 U. S., 282; *U. S.* v. *Macon,* 99 U. S., 589; *Lewis* v. *City,* 108 U. S., 282, *supra; Central Trans. Co.* v. *Pullman,* 139 U. S., 48; *German Safety, etc., Co.* v. *Boynton,* 71 Fed. Rep., 797; *St. L. R. Co.* v. *Terre Haute R. R. Co.,* 145 U. S., 404; *L. & N. R. R. Co.* v. *Ky.,* 161 U. S., 692; 2 Clark & Marshall, Corp., sec. 539, and cases; *Chicago* v. *Cameron,* 22 Ill. App., 91 (120 Ill., 447); *Id.,* secs. 393, 397.

The contract voted on was, as shown by the mayor's proclamation for the election, a subscription of $225,000 to the capital stock of the Natchez road upon the terms and conditions:

"To subscribe" for $225,000 of stock, and to pay "the amount of the subscription of the city," etc. "Upon the execution and delivery of said bonds by said city, and the delivery to the said city of the certificates of stock for which said bonds are to be in payment," said Natchez road "is to deliver to Britton & Koontz, bankers, as agents and trustees, $600,000 in the 7 per cent mortgage bonds of said company, issued the first day of April,

A.D. 1880, in manner and form according to law," . . . "to be held as collateral by said agents and trustees for the purpose of indemnifying and saving harmless said city from any damage or risk arising from said subscription to said capital stock by paying the principal and interest of said bonds; and prevent any levy of tax to pay any part of the principal or interest of said bonds." "That said railroad company may, at any time, pay and redeem said mortgage bonds so pledged and hypothecated, and thereby repurchase from said city said certificates of stock, and may also negotiate said collaterals for any part thereof in payment of the city bonds or in payment of any mortgage existing on the road at the date hereof."

That, as recited in the minutes, it became the mayor's duty under sec. 17 of said act, entitled, "An act to incorporate the Natchez, Jackson & Columbus Railroad Company," to subscribe to the capital stock of said Natchez road, in the name of the city of Natchez, the said amount of $225,000 so voted to be subscribed, and to receive certificates therefor.

This $600,000 of mortgage bonds were authorized to be issued, as recited in the resolutions authorizing their issuance, for "the purpose of constructing and maintaining the railroad . . . between the cities of Natchez and Jackson, a loan be negotiated and money be borrowed upon the credit of said company," etc.; and yet, with these recitals in the face of the mortgage, this issue of $600,000 is diverted from the authorized purpose of issuance to be used as indemnity against this stock subscription.

"Construction" means the building of tracks, side tracks, switches, terminals, etc., and it refers to the building of the railroad itself, and not to equipment. 23 Am. & Eng. Ency. Law (2d ed.), 710; *Phil. R. Co.* v. *Williams,* 54 Pa. St., 103; 23 Am. & Eng. Ency. Law (2d ed.), 720; *Mellon* v. *Morristown R. R. Co.* (Tenn.), 35 S. W., 464; *Brown* v. *Buck,* 54 Ark., 453; *Pac., etc., Co.* v. *James Con. Co.,* 68 Fed. Rep., 966; *Miss., etc., R. R. Co.* v. *Brown,* 14 Kan., 577; *Atchison, etc.,*

*R. R. Co.* v. *McDonnell,* 25 Kan., 370; *Commonwealth* v. *Smith,* 10 Allen, 457, 458; Jones on Corp., Bonds & Mort., sec. 10; *L. & N. R. R. Co.* v. *Ky.,* 161 U. S., 685.

In *So. Pac. Ry. Co.* v. *Esquiral,* 36 Am. & Eng. Rd. Cas., 418, it was held: "The power to procure means to construct the road in question was not a general power; it was a particular power to be exercised for a special object." *Frazer* v. *East Tenn. R. Co.* (88 Tenn.), 40 Am. & Eng. E. R. Cas., 365; *Thomas* v. *West Jersey R. R. Co.,* 101 U. S., 7; *State* v. *Morgan,* 28 La. Ann., 482; *Atkison* v. *Marietta R. Co.,* 15 Ohio St., 21; *Pittsburg R. Co.* v. *Allegheny Co.,* 63 Penn., 126; note to *Glouinger* v. *Pittsburg R. Co.,* 46 Am. & Eng. Rd. Cas., 292, *et seq.; Louisville Ry. Co.* v. *Louisville Trust Co.,* 174 U. S., 552; *Citizens & Co.* v. *Perry Co.,* 156 U. S., 709, 710; *Sutless* v. *Lake Co.,* 147 U. S., 238; *Central Trust Co.* v. *Pullman Co.,* 139 U. S., 48.

Directors must refer to the stockholders the question of accepting an amendment to the charter. 1 Cook on Stockholders, sec. 499; 1 Cook on Stockholders, secs. 500 (note 1), 501; *N. O., J. & G. R. R. Co.* v. *Harris,* 27 Miss., 517; *Hester* v. *Memphis, etc., R. R. Co.,* 32 Miss., 381; *Knoxville* v. *Knoxville R. R. Co.,* 22 Fed. Rep., 763; *Stevens* v. *Rutland R. R. Co.,* 29 Vt., 5; *State* v. *Accommodation Bank,* 26 La. Am., 288; *Alexander* v. *Atlanta R. R. Co.,* 15 Am. & Eng. Rd. Cas., 377; 1 Thompson on Corp., sec. 76; *Clearwater* v. *Meredith,* 1 Wall., 25; 2 Am. & Eng. Ency. Law (2d ed.), 680, 681.

A dissenting stockholder has the right to stand upon the contract of association, as made, and equity will grant him relief, either preventing or annulling, against any acts of the majority beyond their powers. *Mason* v. *Pewabic Min. Co.,* 133 U. S., 50; *Dodge* v. *Wolsey,* 18 How., 331; *Hawes* v. *Oakland,* 104 U. S., 450; *Central R. Co.* v. *Collins,* 40 Ga., 617; *Carson* v. *Iowa, etc., Co.,* 80 Iowa, 638; *Erwin* v. *Oregon R. Co.,* 27 Fed. Rep., 625; *Pender* v. *Pusbington L. R.,* 6 Ch., 70.

The question of power of the legislature to fundamentally

amend charters, without unanimous consent, under general statutes reserving the power to amend, alter, or repeal, was considered in a clear opinion, precisely in point, in *Mills* v. *Central R. R. Co.,* 41 N. J. Eq., 1; and also in *Zabriskie* v. *Hackensack R. Co.,* 18 N. J. Eq., 178 (s.c., 90 Am. Dec., 617); *Black* v. *Delaware Co.,* 24 N. J. Eq., 468.

The rule is uniform in this state that counties can be bound only by acts of boards of supervisors entered upon their minutes in all classes of cases—governmental or private and as a public body.

In *Jefferson County* v. *Grafton,* 74 Miss., 435, it was held that the board of supervisors had no power to convey or deal with the property of the county, whether public or private, unless expressly authorized by statute, and that these county matters differed from municipalities proper, and that where the board of supervisors had sold and conveyed a piece of land owned by the county for private, as contradistinguished from public, purposes, under Code 1880 there existed no power in the board to sell it, and that the deed conveying it should be set aside, even as against subsequent purchasers for value; and this when the sale was made in 1883 and the bill was filed in 1896, or thirteen years afterwards.

In *Adams* v. *N. J. & C. R. R. Co., supra,* it was held that these counties were owners of the stock in their private capacity, under this charter, and free from legislative control, and that the legislature had no power to appoint an agent to bring suit to protect the counties' interests therein.

In *Monroe County* v. *Strong,* 78 Miss., 565, it was held that the county was not bound by an *ultra vires* contract for a bridge, after full performance, because the limitation on its power of payment was disregarded in the contract.

*Blodgett* v. *Seals,* 78 Miss., 522, 524, held: "The property rights vested for management in public boards can only be passed by them by appropriate action taken by them in open session and by a majority vote of those present. ... Such

assignment, if made, could only be evidenced by its minutes to that effect. Here only some random talk was had with or between the members of the board or of its executive committee," etc.

Hence, we insist that there could be no estoppel as to the *ultra vires* act of the board of directors in hypothecating said $600,000 of bonds to indemnify Natchez, and in promising to pay the $225,000 Natchez bonds, even though the president of the board of supervisors of Adams county was present when the agreement so to do was reported to the stockholders of the Natchez road, and his failure to vote against it, or even his voting for the report, being beyond the power delegated to him.

It is not even claimed that the president of the board of supervisors of Adams county ever reported this agreement to indemnify Natchez to the board of supervisors of Adams county, or that the board ever made an order approving of the *ultra vires* change of contract, or the *ultra vires* use of the $600,-000 of bonds. The alleged estoppel rests upon the mere fact that the president of the board of supervisors of Adams county was present, and that it does not appear that he voted against the report of the president of Natchez road stating that that agreement had been made by the directors.

It was *ultra vires* the charter to borrow money to consolidate the debts, liens, and incumbrances. The two then pressing debts were that of the city of Natchez for the $225,000 and the $150,000 accommodation paper. These were not construction debts, or even valid debts of the company, for the reasons stated, *supra.*

The directors who had made this accommodation paper for $150,000 with themselves and the city of Natchez became, in 1883, urgent for the payment of their debts. Gen. Martin went to New York to borrow money to discharge these pressing debts, and being unable to sell the bonds to do this, he, with the authority and procuration of these creditor-directors, made a loan, couched, to hide usury, in the form of a sale of

N. Y., West Shore, etc., R. R. bonds from Drexel of $320,000 for the company's note of $304,000 and 8 per cent interest and commissions, and which cost to obtain, in usury, commissions, etc., over $95,000. That this was grossly usurious and shocking to the conscience goes without saying. And yet these creditor-directors authorized and ratified this transaction to pay themselves. That this transaction was a "loan" is shown by the minute book 2, where Gen. Martin reports it as a "loan." That Drexel knew that it was a "loan" is conclusively shown by the contract of June 4, 1883, evidencing the transaction, and by the agreement between Drexel and Jesup, Ex. 11, to the deposition of Samuel Sloan, and where it is recited as a "loan."

These directors then, to pay themselves, had the called meeting of April 20, 1883, at which there were present six out of ten of these accommodation-paper directors, and they, by their votes, granted this authority. Then, at the called meeting at which this Drexel loan was again considered and authorized of May 17, 1883, five out of the ten present were accommodation-paper directors.

And so on June 12, 1883, when the report of Gen. Martin was made of the Drexel loan of $304,000, and his act in making the contract of June 4, 1883, was confirmed, six out of the nine present were accommodation-paper directors.

Aside from the grossly usurious character of this transaction, it was void because by it these directors voted to borrow money to pay themselves, and to issue $1,500,000 of stock and $1,250,-000 first mortgage bonds as security therefor, and which stock and bonds were to become, upon condition, the absolute property of Drexel upon default in payment of the $304,000 notes. Thus these directors bargained away, practically, the whole corporate property to pay themselves.

*It was void because usurious.*

Chap. 4, Tit. Ill., N. Y. Rev. Stat. 1882, pp. 2253–4 makes void all notes, etc., for more than six per cent interest.

The hypothecation of the bonds and stock as collateral security to the usurious loan under the statute of New York and its decisions was void and recoverable in trover by the pledger. Colebrooke, Collat. Sec., secs. 135, 136, 137.

The answer does not set up that the transaction, though usurious as to individuals, was not usurious, because the statute of New York does not permit corporations to plead usury. It defends on the ground that the transaction was a sale, and not a loan. The very allegations of the answer itself, properly interpreted, show it was a loan, and not a sale.

The rule of public policy prevails and makes this class of contracts void as unlawful; and it would seem that in a controversy between a stockholder, claiming adversely to the act of the corporation, and the parties, wrongdoers, claiming under the unlawful act against the stockholder, such claimant should not be allowed to set up the disability of the corporation to plead usury to defeat the suit of the stockholders. The positions are reversed: Drexel claims under the unlawful act of the Natchez road, the stockholders seek to annul that unlawful act; Drexel claims in privity under the unlawful act, the stockholders adversely to and in denial of it. Under such circumstances we insist that Drexel should not be allowed to take advantage of the unlawful act. The directors here have done an act forbidden by law. *McWilliams* v. *Phillips,* 51 Miss., 196.

This contract, aside from the usury statute, was void as being a fraudulent, unconscionable bargain. *Inge* v. *Building Ass'n,* 79 Miss., 20.

A mortgagee whose security is tainted with usury cannot claim any rights as a *bona fide* holder against secret equities. *Mayer* v. *Cook,* 85 Ala., 417; *Smith* v. *Lehman,* Ib., 294; Webb on Usury, sec. 392; *Banks* v. *Flynt,* 10 L. R. A., 459; Colebrooke, Collat. Sec., secs. 135, 136, 137; *Union Nat. Bank* v. *Fraser,* 63 Miss., 232.

A void usurious contract cannot constitute a valid consideration for a subsequent *assumpsit.* *Beauchamp* v. *Leagan,* 14 Ind., 401, *supra; Kendrickson* v. *Godsey,* 54 Ark., 193, *supra.*

This amendment to the charter authorizing a sale or consolidation was a fundamental change, and required the unanimous consent of the stockholders.

Where a corporation is created without power to consolidate, either under its charter or general laws, a grant of authority to consolidate, either under its charter or general laws, except in the form of an enabling act, makes a change of a material and fundamental character in its charter. The exercise of the power conferred under such condition requires the unanimous consent of the stockholders. Noyes, Inter. Corp. Rel., sec. 42.

The legislature has no power to authorize a consolidation except by unanimous consent. *Zabriskie* v. *Hackensack R. R.,* 18 N. J. Eq., 178; *Black* v. *Delaware, etc.,* 24 *Id.,* 468; *Mills* v. *Central R. R.,* 41 *Id.,* 1. In *Hale* v. *Cheshire,* 161 Mass., 443, and *Market St.* v. *Hellman,* 109 Calf., 571, it was held that the legislature had power to authorize a majority of the stockholders to accept a fundamental amendment. No such power was attempted to be exercised here. All the cases concur that unless the legislature does expressly authorize the majority to accept the amendment, it requires unanimous consent. 2 Cook, Stock and Stock. (3d ed.), sec. 896.

Power to sell or consolidate must be express or by necessary implication. "Any ambiguity in the terms of the grant must operate against the corporation." *Am. Trust Co.* v. *M. & W. R. Co.,* 115 Ill., 651; *Black* v. *Del. Canal Co.,* 24 N. J. Eq., 455. The withholding of a power to sell is a denial of the right to exercise that power. *Am. Trust Co.* v. *M. & W. R. Co.,* 157 Ill., 652; 3 Wood Ry., sec. 486.

This act of 1890, being a fundamental change of the charter, if it was mandatory in its terms, which it is not, would have to be accepted unanimously by the stockholders, and as this was not done, the deed made under it was *ultra vires* and void.

This act of 1890, Acts 1890, p. 676, was a mere *enabling* act, and as such required *unanimous* consent of the stockholders. It merely gave the ·corporation power to do the acts recited, if its stockholders desired; and, hence, the legislative intent was that the stockholders of the Natchez road might or might not, as they might elect, sell or consolidate their railroad..

This act of 1890 did not confer power to sell to Louisville, New Orleans & Texas Railway Company.

. *Mayes & Longstreet,* and *McWillie & Thompson,* for appellees.

*Proposition* 1.—The bill is based throughout on the postulate that because complainants are counties they .are not bound by the ordinary rules of law generally applicable to similar transactions, but have greater rights based on sovereignty. But there is no element of sovereignty in the case. The counties, *quoad hoc,* had precisely the same rights, and were subject to the same liabilities and obligations as natural persons. *Adams* v. *Railroad Co.,* 76 Miss., 714; 1 Cook on Stockholders, sec. 9; *Shipley* v. *Terre Haute,* 74 Ind., 297; *Marshall* v. *Railroad Co.,* 92 N. C., 322; *Bank* v. *Planter's Bank,* 9 Wheat., 904; *Curran* v. *State,* 15 How. (U. S.), 304; *Murray* v. *Charleston,* 96 U. S., 432; *Western Society* v. *City,* 31 Pa., 175; *Same* v. *Same,* 31 Pa., 185.

*Proposition* 2.—Passing by, for the present, any discussion of the lawfulness or the alleged fraudulent character of the several transactions assailed by the bill, we submit that these complainants cannot successfully assail them, for the reason that what was done was done by them. All the early history of the Natchez, Jackson & Columbus Railroad Company was made by them absolutely. Until 1881 Adams county alone owned and voted $300,000 of the total $335,809 of stock; in 1881 that county owned and voted $300,000 and the city of Natchez $225,000 out of a total of $560,809; in 1882, and until February, 1887, Adams county owned and voted $300,000,

Hinds county $200,000, and the city of Natchez $225,000, out of a total of $760,809. Wherefore, until 1882 the county of Adams controlled the company and all of its dealings absolutely; and from 1882 until Mr. Drexel closed his contracts and took charge, in April, 1887, the two counties did the same. What was done previous to the latter date was in effect done by complainants *themselves;* afterwards what followed was the logical and certain result of their action. *Pearsall* v. *Great Northern Railway,* 161 U. S., 646, 671.

*Proposition 3.*—The contract of 1883 with Mr. Drexel is assailed as grossly usurious and oppressive, but it was not. Section 22 of the company's charter expressly empowered it to sell its notes, bonds, and stock at such rates as its directors considered would best advance its interests, and expressly declared that when sold they should be valid as if sold at par. *Railroad Co.* v. *Ashland Bank,* 12 Wall., 226. Nor was it usurious, considered as a New York transaction, under the statutes of that state, for by these very statutes it is declared that no corporation shall set up the defense of usury. *The Vigilancia,* 68 Fed., 781; *Railroad Co.* v. *Bank,* 12 Wall., 226; *Hubbard* v. *Todd,* 171 U. S., 474; *Lane* v. *Watson,* 51 N. J. Law, 186; *Trust Co.* v. *Auten,* 68 Ark., 229. But, moreover, it would not have been usurious under the law of New York, even between natural persons. No difference what might have been Mr. Drexel's designs and motives, the evidence shows uncontradictedly that President Martin intended, not a loan with a contrivance to cover up usury, but a *bona fide* and final *purchase* of the West Shore bonds. *Bank* v. *Snodgrass,* 4 How. (Miss.), 573; *Bass* v. *Patterson,* 68 Miss., 310; *Chaffe* v. *Hughes,* 57 Miss., 256; *Matlock* v. *Cobb,* 62 Miss., 43; *Ayvault* v. *Chamberlain,* 33 Barb., 229; *Bank* v. *Waggoner,* 9 Pet., 378, 404; *Smith* v. *Beach,* 3 Day, 268, 271; *Mills* v. *Crocker,* 9 La. Ann., 334; *Selby* v. *Morgan,* 3 Leigh., 577; *Culver* v. *Bigelow,* 43 Vt., 249; *Willoughby* v. *Comstock,* 3 Edw. Ch., 424; *Kelly* v. *Sprague,* 58 Hun., 611; *Brockenbrough* v. *Spindle,* 17 Gratt.,

21; *England* v. *Moore,* 3 Houst., 289; *Stuart* v. *Bank,* 19 Johns., 508; *Thomas* v. *Murray,* 32 N. Y., 605; *In re Kellogg,* 113 Fed. Rep., 120, 129.

The mere wisdom or unwisdom of the transaction is not open for judicial examination. Thompson on Corp., sec. 4003; 21 Am. & Eng. Ency. Law, p. 865.

*Proposition 4.*—Complainants urge further that the agreement of 1883 was fraudulent and void as to them because made in great part in order to pay off the $150,000 debt, as to which certain of the directors were practically indorsers. But the rule that directors of an insolvent corporation may not prefer themselves has no application. The agreement of 1883 was made by a "going" concern, not in contemplation of insolvency or a cessation of business, but to carry on its construction and in furtherance of the ends of its creation. By that agreement the company was enabled to pay off debts lawfully incurred, for which $1,500,000 of stock was lawfully pledged; and thereby the ownership of two-thirds of the property and the complete control of the company were saved, for, as it turned out, four years longer. The discharge which the directors got from their contingent liability was merely incidental. *Sells* v. *Grocery Co.,* 72 Miss., 590; *Richardson* v. *Davis,* 70 Miss., 219; *Love Mfg. Co.* v. *Queen City Co.,* 74 Miss., 290; *Twin Lick Co.* v. *Marbury,* 91 U. S., 587; *Hanchett* v. *Blair,* 100 Fed., 817, 823; *Fitzgerald Co.* v. *Fitzgerald,* 137 U. S., 98, 110; *Garden* v. *Butler,* 30 N. J. Eq., 721; *Harts* v. *Brown,* 77 Ill., 226; *Mullanphy Bank* v. *Schott,* 34 Ill. App., 500; *Glouninger* v. *Railroad Co.,* 139 Pa. St., 13.

*Proposition 5.*—Complainants maintain that the condition attached to the Natchez subscription—to wit, that the company should pay off the bonds and interest—was void; that the subscription was in effect unconditional, and that the act of the directors in borrowing money in 1887 with which to pay those city bonds led to the loss of the road to the original stockholders, and avoided the whole transaction as to the counties. Even if other-

wise well taken, that point cannot be successfully made by these complainants or at this late day. But there is nothing in it, in any event. No special authority, in any statute, was needed in order to enable the counties to impose conditions on their subscriptions. *Clark* v. *Rosedale,* 74 Miss., 543; *Converse* v. *City,* 92 U. S., 503; 20 Am. & Eng. Ency. Law, 1118. Moreover, if such authority had been necessary, its absence was cured by Laws 1882, p. 1027, which recognized the subscription and its conditions.

*Proposition 6.*—Complaint is also made because at the annual meetings of 1888 and 1889 the directors were elected and the practical control of the road was taken by the holders of the $1,500,000 of stock issued, as aforesaid, in April, 1887, to the order of Mr. Drexel. The argument seems to be that such stock was wrongfully issued and was fraudulent in effect, as against the other stockholders. The idea seems to be that when the $150,000 borrowed in 1883, and for which $1,500,000 of stock had been in effect pledged as security, was paid, the company's title to the stock so pledged was cleared, and the stock should have been canceled. But, as already shown, the lender of the money which paid off the $150,000 (and more) required and took the stock as collateral for his loan, and the company's title to it was not cleared; it was a mere change of pledges. Moreover, the complainants themselves voted for those very directors, and cannot now complain of their own nominees. *Windmuller* v. *Distributing Co.,* 114 Fed., 491, 494; *Farmer's L. & T. Co.* v. *Railroad Co.,* 163 U. S., 31, 44; *Pender* v. *Lushington,* L. R., 6 Ch. D., 70; *Camden R. R.* v. *Elkins,* 37 N. J. Eq., 273; *Hodge* v. *U. S. Steel Corp.,* 60 L. R. A., 742, 747; *Rogers* v. *Nashville R. R.,* 10 Am. & Eng. Corp. Cas., 82, 106.

*Proposition 7.*—The consideration of the sale of the road to the Louisville, New Orleans & Texas Railway Company was not fictitious, as is claimed by complainants. Mr. Drexel paid for his stock and the $1,250,000 of bonds over $788,000. The evidence shows clearly that sum was the full value of the road in its then

condition, and certainly the stock and bonds could not be worth more than the road. In fact, he exchanged all of both stock and bonds so purchased by him with the Financial Improvement Company for $800,000 of Louisville, New Orleans & Texas Railway Company's four per cent bonds. The bonds and stock so acquired by the Improvement Company therefore cost it $800,000 of Louisville, New Orleans & Texas Railway bonds and $180,000 cash. Neither is there anything in the claim that the $180,000 cash payment was a fiction, because the amount having first been credited to the Canton, Aberdeen & Nashville Railroad Company, was afterwards credited to the Louisville, New Orleans and Texas Railway Company. The undisputed evidence shows that the Canton, Aberdeen & Nashville Railroad Company owed the Louisville, New Orleans & Texas Railway Company more than that amount for moneys advanced for betterments, and the debt was thereby canceled, *and no creditor has ever complained.*

*Proposition* 8.—The sale of 1890 to the Louisville, New Orleans & Texas Railway Company was not void for want of authority in the directors to make it without the special consent of the stockholders. Section 9 of the charter gave such authority, in effect, and in such case the stockholders have consented in advance, it is their charter contract. 3 Thomp. on Corp., sec. 3983; *City* v. *Gas Co.,* 70 Mo., 69, 98.

*Proposition* 9.—Nor was the sale of 1890 void because in the stockholders' meeting which ratified it one of the stockholders voted fifty-four shares against it. Unanimous consent is not necessary to the sale by a private corporation of its entire property when its business is unsuccessful. *Berry* v. *Broach,* 65 Miss., 450; *Wilson* v. *Miers,* 100 E. C. L., 348; *Treadwell* v. *Mfg. Co.,* 7 Gray, 393; *Sargent* v. *Webster,* 13 Metc., 497; *Sewell* v. *East Cape Co.,* 50 N. Y. Eq., 717; *Hodges* v. *New England Co.,* 1 R. I., 347; *Peabody* v. *Waterworks,* 37 Atl. Rep., 807; *Hayden* v. *Official, etc.,* 42 Fed., 875. Nor is the

rule different because the corporate property is affected with a public use.   7 Am. & Eng. Ency. Law, p. 474; *Gibbs* v. *Gas Co.,* 130 U. S., 396; *Lanman* v. *Railroad Co.,* 6 Casey, 42; *Grate* v. *Railroad Co.,* 5 Wright, 447; *Commonwealth* v. *Railroad Co.,* 53 Penn. R., 9; *Treadwell* v. *Salisbury Co.,* 7 Gray, 393; Grant on Corp., 68; *Black* v. *Delaware Co.,* 22 N. Y. Eq., 130; *Berger* v. *U. S. Steel Corp.,* 53 Atl. Rep., 14, 68.

The *state's* consent to the sale was, moreover, given by the act of February 19, 1890.

·*Proposition* 10.—Complainants are estopped on all the points of objection now made by them; estopped by participation, by acquiescence, by laches—in every way possible.   Step by step the two counties in effect managed the road, and step by step took part in its affairs.   And that was true as to Adams county, from 1871 until the end, acting by the president of the board of supervisors, as provided in the charter; and as to Hinds county, from 1882 until the end, acting by its own two directors. *Berry* v. *Broach,* 65 Miss., 450; *Railroad Co.* v. *Graham,* 60 N. E. Rep., 405; *Bradford* v. *Railroad Co.,* 142 Ind., 383; *Crump* v. *Colfax Co.,* 52 Miss., 107; *Handley* v. *State,* 139 U. S., 417; *Ins. Co.* v. *School Dist.,* 80 Fed., 366; *Brookhaven* v. *Lawrence Co.,* 55 Miss., 187; *Houston* v. *Building Ass'n,* 80 Miss., 31, 42; *Smith* v. *Duncan,* 16 N. J. Eq., 240; *Smith* v. *Clay,* 3 Bro. C. C., 640, note; *Terry* v. *Eagle Co.,* 47 Conn., 141; *Alexander* v. *Searcey,* 81 Ga., 536; *Rabe* v. *Dunlap,* 51 N. J. Eq., 40; *Boston, etc.,* v. *Railroad Co.,* 13 R. I., 260; 18 Am. & Eng. Ency. Law, pp. 114, 115, 126; 2 Cook on Corp., sec. 732; *Harwood* v. *Railroad Co.,* 17 Wall., 78; *State* v. *Bailey,* 19 Ind., 452; *State* v. *Milk,* 11 Fed., 389; *Johnson* v. *Transit Co.,* 156 U. S., 618.

Argued orally by *M. Green,* for appellants, and by *Edward Mayes,* for appellees.

ALEXANDER, Special Judge, delivered the opinion of the court.*

This is a suit brought by the counties of Hinds and Adams, as stockholders of the Natchez, Jackson & Columbus Railroad Company, to cancel, as fraudulent in fact and unauthorized in law, the sale by that company of its railroad property and franchises to the Louisville, New Orleans & Texas Railroad Company, and for other incidental relief. The sale was made pursuant to an act of the legislature approved February 19, 1890 (Laws 1890, p. 675, ch. 502), entitled "An act to authorize the Natchez, Jackson & Columbus Railroad Company to sell its railroad situated in this state, or to consolidate the same." Section 1 of the act authorized the company to sell absolutely all or any part of its railroad, including its franchises. Section 2 empowered the Louisville, New Orleans & Texas Railway Company to consolidate with the Natchez, Jackson & Columbus Railroad Company on such terms as might be agreed on by them.

The record contains a complete history of the Natchez, Jackson & Columbus Railroad Company, in its minutest details, from its incorporation and organization. After a careful examination of all the evidence relied on by plaintiffs as establishing fraud, we concur with the chancellor in his finding: that there was no actual fraud either on the part of the buying or selling corporation, in the sale itself or in any of the dealings culminating in the sale. Nor do we find any actual fraud in the issuance, hypothecation, or sale of capital stock. On the contrary, we think that the history of the Natchez, Jackson & Columbus Railroad Company presents a record singularly free from any suspicion of misconduct, and characterized by scrupulous regard for stockholders and fidelity and fairness to creditors. At the time the company was chartered, in 1870, it could hardly have been considered a promising business venture by

---

*Judge Calhoon, having been of counsel before his appointment to the bench, recused himself, and C. H. Alexander, Esq., a member of the supreme court bar, was appointed and presided in his place.

those conversant with the then conditions in this state. Projected without any capital stock or financial backing, and dependent for its construction almost wholly upon county aid, its natal and normal condition was insolvency. That the task of its construction was undertaken at all was due mainly to the indomitable zeal and energy of its chief promoter and for many years its president, Gen. W. T. Martin. Undaunted by difficulties, he successfully encountered all the vexations and grappled with all the problems that arose during the ten years of construction, and, we might add, without receiving the emoluments which are usually thought to be consequent upon the position of a railroad president. The company was chartered in 1870, and the first subscription to its capital stock was made in the following year by Adams county, which voted to subscribe for $600,-000 of the stock and issue its bonds to pay therefor. The legality of this subscription was afterwards questioned, and by a compromise settlement it was reduced one-half. The corporation was then permanently organized; and as only a comparatively trifling amount of stock was then or at any time afterwards subscribed by individuals, Adams county had practically exclusive control of the enterprise. With the money obtained by discounting these county bonds and with funds borrowed on its own obligations and mortgages at ruinous rates of interest, the railroad crept along from Natchez to Jackson, building by piecemeal, and so slowly that the equipment of sections first built was old and worn out before the road was completed, and the interest on its indebtedness amounted to almost as much as the cost of the road.

In 1880 the city of Natchez was induced to vote a subscription of $225,000 to the capital stock, conditioned on the guaranty of the railroad to pay the interest and principal on the city's bonds as they matured, and thus prevent any levy of taxes to pay them. This subscription is assailed by complainants as *ultra vires,* and the guaranty of the railroad company and the

issuance of the mortgage bonds to secure such guaranty are attacked as beyond the power of the corporation.

Before the railroad was completed to the Hinds county line, the county of Hinds voted a subscription of $200,000 to the capital stock of the company, but to be used only in payment for the construction of the road within the county. Thus the bonds of the county to pay for the subscription did not become available until 1882. Meanwhile the stock of the company was greatly embarrassed, and, having no credit, it procured certain of its directors in Natchez to lend their credit to the company by executing their accommodation notes, aggregating $150,000, to be used by the company as collateral security. These notes were obtained on a nominal sale of stock to the amount of $1,-500,000, being on the basis of ten cents on the dollar, and issued subject to the right of the company to repurchase it within some short fixed period at a slightly advanced price. By the hypothecation of these accommodation notes and of this stock and by pledging the undelivered Hinds county bonds, the needed loan was secured. In connection with the issuance, sale, and hypothecation of the stock and bonds of the company, it is well to note that the charter of the railroad company authorized it to borrow money upon its own credit for the purpose of constructing and maintaining the railroad, and to issue its corporate bonds or promissory notes, and to mortgage its railroad and franchises, and to sell, dispose of, or negotiate its bonds and corporate stock at such prices as, in the judgment of the company, evidenced by the voice of two-thirds of the directors, would best advance its interests, and if such bonds, notes, or stock should be sold at discount, the sale should nevertheless be valid for the par value thereof.

In January, 1883, matters being in the general condition above described, the company, through its president, and pursuant to an order of its directors, entered into a contract with Jos. W. Drexel, by which, in consideration of the company's obligation to pay $304,000 in twelve months and a transfer and

delivery to Drexel of 30,000 shares ($1,500,000) of stock of the company and $1,250,000 of bonds secured by second mortgage on the railroad, Drexel turned over to the company certain bonds of the New York, West Shore & Buffalo Railroad Company, of the face value of $320,000, which could be sold and were sold by Gen. Martin, but at a discount of more than twenty per cent. The agreement with Drexel further stipulated that, upon default in the payment of the company's obligation, all of the stock and bonds hypothecated should become the absolute property of Drexel, upon the further condition that he should pay off all the outstanding mortgages of the railroad company, estimated to be about $425,000. This transaction is characterized by complainants as a loan, and is assailed by them as usurious, and also illegal, on the ground that it was voted by the directors to provide a mode of payment of the debt secured in part by their own accommodation notes aforesaid and to pay the debt of the company growing out of its guaranty of the city of Natchez bonds. The note or obligation of Drexel was extended from year to year, but meanwhile the city of Natchez was being pressed and importuned by the holders of its bonds; and the railroad company obtained another loan on short credit from Morris K. Jesup, trustee for Drexel, to pay off the bonds of the city of Natchez. These were paid, and the mortgage bonds which had been pledged to secure performance of the company's guaranty in favor of the city were transferred, to be held as collateral for Drexel. Thus Drexel, through his trustee, held practically all of the stock of the company, except that owned by the counties of Adams and Hinds; and the right of the company to redeem, under its contract, having been lost by default, Drexel claimed the absolute ownership of the stock and bonds. Thereupon the directors, on May 6, 1887, waived the right to redeem, and by a formal order directed the reissuance and delivery of the said amount of stock to such persons as might be indicated by Jesup, which was done. The latter then, in execution of his part of the contract, procured a surrender to

the company of all the outstanding mortgage notes and bonds which he had conditionally assumed to pay. Thus Drexel and Jesup and their appointees came into the ownership and possession of a controlling interest in the Natchez, Jackson & Columbus Railroad Company, and at the succeeding annual meeting, in January, 1888, dictated the selection of the directory. At the same meeting T. J. Nichol became president of the company instead of Gen. Martin.

In March, 1889, the Drexel and Jesup stock and bonds were sold to the Financial Improvement Company, a construction company organized and controlled by the shareholders of the Louisville, New Orleans & Texas Railroad Company; and the control of the railroad company thus passed to those identified in interest, if not in name, with the company. On February 19, 1890, on the procurement of the officers of the Louisville, New Orleans & Texas Railroad Company, the act of 1890 (Laws 1890, p. 675, ch. 502) was passed, authorizing the sale of the Natchez, Jackson & Columbus Railroad, or its consolidation with the Louisville, New Orleans & Texas Railway Company. Soon after the passage of the act the directors of the Natchez, Jackson & Columbus Railroad Company met, and, by the unanimous vote of the directors who were present, accepted the provisions of the act, and made a sale of the railroad and other property and the franchises of the company to the Louisville, New Orleans & Texas Railway Company, and directed the necessary conveyance to be executed. The directors also called a meeting of the stockholders to consider the matter of ratification of the sale, and at the meeting of the stockholders thus called the action of the directors was ratified. There was only one stockholder—the owner of fifty-four shares—who voted in the negative. The deed was thereupon executed, and the Louisville, New Orleans & Texas Railway Company (now, by consolidation, the Yazoo & Mississippi Valley Railroad Company) took exclusive control of the railroad and other property of the Natchez, Jackson & Columbus Railroad Company.

We have given a mere outline of the history of the railroad, stating only so much as we think necessary to a proper understanding of the legal principles which must be decisive of the controversy.

The first ground of attack on the sale is that, while the act of 1890 gave the Natchez, Jackson & Columbus Railroad Company authority to sell, the Louisville, New Orleans & Texas Railway Company had no authority under the act or under its own charter to buy. It is sufficient as to this to say that whatever complaint might be made by creditors of the selling corporation or stockholders of the purchasing company or by the state in its sovereign capacity, this objection cannot be made by the selling company or its stockholders. *Fritts* v. *Palmer,* 132 U. S., 282 (10 Sup. Ct., 93; 33 L. ed., 317); *Union National Bank* v. *Mathews,* 98 U. S., 621 (25 L. ed., 188); *Ohio Railroad Co.* v. *McCarthy,* 96 U. S., 258 (24 L. ed., 693). See, also, *Quitman County* v. *Stritze,* 70 Miss., 320 (13 South. Rep., 36).

The next objection is that the act of .1890 was an amendment of the charter of the Natchez, Jackson & Columbus Railroad Company, and, being fundamental in its nature, it could not be operative until accepted by all of the stockholders. We are aware of the rule announced by many courts that, even although the right is reserved in the state to repeal, alter, or amend the charter, an amendment which fundamentally changes the nature of a corporation cannot be imposed upon it if any of the stockholders dissent. This rule, if correct, has no application in this case. Even in the absence of express statutory power, a private corporation doing a losing and unprofitable business may sell its entire assets upon a vote of a majority of the stockholders. *Berry* v. *Broach,* 65 Miss., 450 (4 South. Rep., 117, citing Morawetz on Priv. Corp., sec. 413); Wood's Field on Corp., sec. 445; Cook, Stock & Stock., sec. 668. It is true that a railroad corporation has *quasi* public functions. but where the state, by a valid statute, has assented to the sale,

as in this case, all difficulty on this account is removed. Whatever interest the public might have in the continued ownership and operation of the road by the corporation, this interest was certainly committed to the control of the legislature. *Treadwell* v. *Salisbury Mfg. Co.,* 7 Gray, 393 (66 Am. Dec., 490); *Black* v. *Delaware Canal Co.,* 22 N. J. Eq., 130.

It is not denied that the sale was approved by a majority of the stockholders present and voting, but the point is made that the stock held and voted by the Financial Improvement Company and its appointees was illegally issued and wrongfully acquired by Drexel and Jesup and their assignees, and could not be lawfully voted. There does not seem to have been any concealment from stockholders or the public of any of the facts or circumstances connected with the issuance, hypothecation, or sale of this stock. Whatever right other stockholders might have had to question the validity of this stock, the county of Adams cannot be heard to complain. By virtue of its ownership of a majority of the stock, it had virtual control of the company from its organization in 1871 until 1882; and after that, until 1887, the counties of Adams and Hinds together controlled the company. At every meeting of stockholders from 1872 to 1889, Adams county was represented by the president of its board of supervisors, and all the acts of its officers and directors were reported to and ratified by the stockholders. The county of Adams, by the president of its board of supervisors, participated in the issuance of this stock; and it was by its consent, if not by its active procurement, that the stock was placed with Drexel and Jesup. Consequently the county cannot object that the owners exercised the right incident to ownership of voting the stock at the stockholders' meetings. It thus becomes unnecessary to decide whether the appointment of Gen. Martin to represent Adams county stock was invalid because not entered on the minutes of the board of supervisors. Due notice of the meeting was given; and even if Adams county was not rep-

resented, it was bound by the action of the majority of the stockholders.

The case in favor of Hinds county seems to be in no better attitude. After its acquisition of the stock, it was represented at nearly all of the meetings of the directors and stockholders. It is true that the persons assuming to act for it as stockholders were in many instances not appointed by the order of the board entered on its minutes. But, as stated above, we do not think it necessary to decide whether their appointment to vote the stock of the county had to be evidenced of record, for the county was accorded the right to elect one or more persons to represent it on the directory of the company, and during the whole time of its ownership it was so represented on the directory by persons appointed for the purpose by formal orders entered on its minutes. One of the conditions of the subscription to the stock by Hinds county, as appears from the minutes of the board of supervisors, was that the county should be secured representation on the board of directors of the company. The county appointed men for the very purpose of acting as directors, and they were invited by the company to act, and did act, as such, and by their votes and their acquiescence authorized and ratified the very transactions as to the loans and the issuance and disposition of the stock now the subject of complaint. The resolution in the directors' meeting on March 28, 1890, accepting the act of 1890 and directing the sale of the railroad, was introduced by H. C. Roberts, who was acting as a director in the company by the appointment of the board of supervisors of Hinds county, regularly entered on its minutes; and, as if to remove all doubt as to his power under the charter to act for the county and serve as a director, it had caused a nominal amount of its stock to be transferred to him. In determining how far the county of Hinds was bound by the acts of Roberts, it must be borne in mind that the counties did not own and hold their stock in a governmental capacity. This we held in *Adams County* v. *Railroad Company*, 76 Miss., 714 (25 South. Rep., 667). It follows neces-

sarily from the views announced in that case that the county of Hinds held the stock in the same way and subject to the same rights and obligations as purely private corporations or individuals. Incident to this right as owner was the right to appoint such agents to represent its interests as the nature of the property or the business required. The legislature, in providing, as it did in sec. 20 of the charter of the railroad company, that the board of supervisors might appoint any person it saw fit to vote its stock, was merely declaring a right which the county would possess in the absence of a statute—a right incident to its ownership of the stock. It is immaterial by what name the agent was called, if in fact he was duly appointed to represent the county, and did in fact represent it. The fact that in his appointment, on the minutes of the board, he was called a "director," and was accorded and exercised all the functions of a director, sufficiently indicates the scope of his authority. Surely the agent of a private corporation, so appointed and so acting, would bind his principal. So we must hold the county of Hinds bound by the acts of Roberts. *Berry* v. *Broach, supra.*

The cause of appellants has not lacked for ability and zeal of counsel. The transcripts and briefs are exceedingly voluminous, and we have not undertaken to discuss *seriatim* or in detail all of the points presented, many of which are correct as abstract legal propositions. All the material questions presented are determinable in the light of the principles above announced.

*The decree of the chancery court is affirmed.*